**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSSETTS**

| | |
|---|---|
| RICHARD SPOHN, CHARLES LYNCH, LINNEA BEI, and ARLENE CRISAFI, on behalf of themselves and as representatives of plan participants and plan beneficiaries of the IBM Personal Pension Plan, <br><br> Plaintiffs, <br><br> v. <br><br> INTERNATIONAL BUSINESS MACHINES CORP., as Plan Administrator and Sponsor; the IBM RETIREMENT PLANS COMMITTEE, as Plan Administrator; and STATE STREET GLOBAL ADVISORS TRUST COMPANY, as independent fiduciary of the IBM Personal Pension Plan, <br><br> Defendants. | Civil Action No. 1:25-cv-12475-PBS <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

Dated: December 8, 2025

**SCHNEIDER WALLACE COTTRELL KIM, LLP**
Todd M. Schneider*
John J. Nestico*
James A. Bloom*
Charlotte Manyasli*
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone:    (415) 421-7100
Facsimile:    (415) 421-7105
Email: tschneider@schneiderwallace.com
      jnestico@schneiderwallace.com
      jbloom@schneiderwallace.com
      cmanyasli@schneiderwallace.com

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (BBO # 716245)
Caroline C. Donovan*
Logan J. Hagerty*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: ykopel@bursor.com
      cdonovan@bursor.com
      lhagerty@bursor.com

**EDWARD STONE LAW P.C.**
Edward S. Stone*
205 East 42nd Street, Suite 1900
New York, NY 10017
Telephone: (203) 504-8425
Facsimile: (203) 348-8477
E-Mail: eddie@edwardstonelaw.com

*Attorneys for Plaintiff*

**Pro Hac Vice application forthcoming*

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION AND VENUE .......................................................................................... 7

STANDING ........................................................................................................................ 8

PARTIES ........................................................................................................................... 11

FACTUAL ALLEGATIONS ............................................................................................ 14

    I.    Background On The Transfer Of Pension Benefit Responsibilities To Insurance Companies.......................................................................................................... 14

    II.    The Annuity Transactions At Issue.................................................................. 20

    III.    IBM's And State Street's Choice Of PICA Was Imprudent............................. 27

    IV.    PICA Is Far Riskier Than PRU......................................................................... 37

    V.    The Consequences Of Suspect Transactions With Affiliates Are Real And Imminent ... 59

    VI.    IBM's And State Street's Choice Of PICA Was Motivated By Financial Self-Interest And Was Therefore Disloyal And The Transactions Prohibited By ERISA............................ 62

    VII.    Recent Losses Driven By PICA's Reinsurance Captives Further Show That Plaintiffs' Pension Benefits Are Far Less Secure As A Result Of The Transactions....................... 74

CLASS REPRESENTATION ALLEGATIONS ........................................................ 75

CAUSES OF ACTION ................................................................................................... 78

JURY TRIAL DEMANDED........................................................................................... 90

Plaintiffs Richard Spohn, Charles Lynch, Linnea Bei, and Arlene Crisafi ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendants International Business Machines Corporation and the IBM Retirement Plans Committee (together, "IBM") and State Street Global Advisors Trust Company ("State Street") and, collectively with IBM, "Defendants"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on their personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action on behalf of 132,000 affected IBM retirees who formerly participated in the defined benefit pension plan, the IBM Personal Pension Plan (hereinafter the "Plan"), administrated and sponsored by IBM and governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

2.      On September 13, 2022, IBM entered into a group annuity contract involving approximately $16 billion in plan assets with the Prudential Insurance Company of America ("PICA")[1] that resulted in approximately 100,000 of these retirees losing all of the uniform protections intended by Congress under ERISA, including the Federal backstop provided to all ERISA protected plans by the Pension Benefit Guaranty Corporation ("PBGC").

3.      Then, on September 11, 2024, IBM entered into a second group annuity contract

---

[1] *See* PRUDENTIAL, *Prudential and MetLife entrusted to fulfill $16B in pension obligations for 100,000 IBM retirement plan participants and beneficiaries*, (Sep. 13, 2022), https://web.archive.org/web/20250420232352/https://news.prudential.com/latest-news/prudential-news/prudential-news-details/2022/Prudential-and-MetLife-entrusted-to-fulfill-16B-in-pension-obligations-for-100000-IBM-retirement-plan-participants-and-beneficiaries-09-13-2022/default.aspx.

involving approximately $6 billion in plan assets with PICA[2] that resulted in an additional 32,000 retirees losing all of the uniform protections intended by Congress under ERISA, including the Federal backstop provided to all ERISA protected plans by the PBGC.

4.    The combination of unique risks posed by the IBM/PICA transactions are contrary to the best interests of the impacted IBM retirees and have resulted in less secure pension benefits for those retirees.

5.    As a result of the imprudent transactions with PICA, plan participants suffered significant economic harm reflected by the difference in value between their IBM pension benefits that were fully and uniformly protected under ERISA and the current economic value of their non-uniform benefits as unwitting certificate holders under group annuity contracts issued by PICA.

6.    The difference in economic value between remaining an IBM pensioner versus being offloaded to PICA is quantifiable using objective measures.

7.    Plaintiffs believe that the economic losses are equal to at least 5% of the purchase price of the Group Annuity Contracts ("GACs") and could be as high as 15% of the purchase price of the GACs.  One of the reasons that the economic values have to be expressed as a range is because PBGC coverage is uniform and increases as a function of age, while State Guaranty Association ("SGA") coverage is non-uniform and subject to the vagaries of state insurance laws and the ability of SGAs to assess their members as discussed in greater detail below.

8.    Alternatively, Plaintiffs allege that they should be entitled to recover the difference in the economic value of a GAC issued by a more suitable annuity provider such as New York

---

[2] *See* PRUDENTIAL, *Prudential to fulfill $6 billion in protected retirement obligations in second pension risk transfer with IBM* (Sep. 11, 2024), https://news.prudential.com/latest-news/feature-stories/feature-stories-details/2024/Prudential-to-fulfill-6-billion-in-protected-retirement-obligations-in-second-pension-risk-transfer-with-IBM/.

Life Insurance Company, Northwestern Mutual Life Insurance Company or any other suitable annuity provider that does not invest in illiquid high risk assets or engage in the type of non-arm's length affiliated reinsurance transactions and abusive Modified Co-insurance transactions that PICA does as described in detail below.

9.      Following the PRT transactions described herein, 132,000 plan participants have been off-loaded to PICA and approximately 108,566 plan participants remain as plan participants in the IBM pension plan.[3]   Discriminatory treatment of plan participants is not permitted under ERISA.

10.     As such, the transactions described in this Amended Complaint were imprudent, disloyal and otherwise prohibited by ERISA. The IBM retirees have now been transformed into certificate holders under risky group annuities that are no longer regulated by ERISA or insured by the PBGC. As a consequence, impacted retirees are quite rightly fearful and concerned about their futures, the fate of their retirements, and the financial well-being of their beneficiaries.

11.     ERISA imposes strict fiduciary duties on plan sponsors and their independent fiduciaries when they offload company pension obligations to insurance companies through the purchase of annuities. ERISA's fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). The statute requires fiduciaries to act with both prudence and loyalty, "solely in the interest of the" employees who participate in the plan. 29 U.S.C. § 1104(a)(l).

12.     Defendants violated their fiduciary responsibilities in selecting PICA to pay pension benefits for IBM's 132,000 retirees.

---

[3] Figure calculated by subtracting 32,000 from 140,566 [the number of IBM Personal Pension Plan participants as reported by the DOL in 2024].

13.     Instead of going through a rigorous, independent and thorough selection process that took into consideration the requisite analysis that an ordinary and prudent ERISA fiduciary is required to undertake, Defendants chose to purchase substandard annuities for IBM retirees from PICA, which are heavily dependent upon transactions with affiliates that are not transparent and expose plan participants to unreasonable amounts of risk and uncertainty. These affiliates are domiciled in "regulation light" jurisdictions such as Arizona and Bermuda where wholly owned captive reinsurers and affiliates are permitted to count debt instruments as assets and are not required to file publicly available financial statements in accordance with Statutory Accounting Principles ("SAP"), the requisite accounting standard under which all U.S. life insurance companies operate.[4] Without clarity around the assets, liabilities, structure and claims paying ability of these wholly owned captive reinsurance companies and affiliates, Defendants could not possibly have met their obligations as prudent fiduciaries under ERISA.

14.     To be clear, this was done to save IBM money and make State Street money.

15.     Employers like IBM choose the lowest-cost annuity provider in **nearly 80%** of PRT transactions.[5]

---

[4] *See, e.g.*, Will Kenton, *What Is Statutory Accounting Principles (SAP)? Definition*, INVESTOPEDIA (last updated June 28, 2025), https://www.investopedia.com/terms/s/sap.asp ("The Statutory Accounting Principles (SAP) are a set of accounting regulations that govern the financial statements of insurance firms in the United States. They are prescribed by the National Association of Insurance Commissioners (NAIC). The overarching objective of SAP is to assist state regulators in monitoring the solvency of insurance companies."); Kerry Pechter, *Bermuda's Role in a Changing Annuity Industry*, RJI (Sep. 10, 2021), https://retirementincomejournal.com/article/bermudas-role-in-a-changing-annuity-industry/ ("If low rates are a kind of desert, Bermuda represents a palm-fringed oasis. Its financial regulators use Generally Accepted Accounting Principles (GAAP). Under GAAP, estimates of annuity liabilities—what insurers owe to policyholders or contract owners—can be lower than under Statutory Accounting Principles (SAP), which insurers must follow when preparing financial statements for regulators in the US.").

[5] Fiona Ng et al., *Pension risk transfer: Staying current in a rapidly evolving market,* MILLIMAN (Jun3 23, 2023), https://www.milliman.com/en/insight/pension-risk-transfer-staying-current-evolving-market; AON, *U.S. Pension Risk Transfer: Market Insights: March 2023*, at 12,

16. Additionally, State Street has enormous financial stake in both Prudential, PICA's direct parent and IBM, as explained below. *See infra* ¶¶ 183-93.

17. Defendants' failure to reconcile massive, related party transactions that go directly to PICA's ability to make pension payments to Plaintiffs and Class Members for decades is at the heart of this case.

18. Attached hereto as **Exhibit A** and incorporated herein by reference is the Declaration, signed under penalty of perjury, of Thomas D. Gober, a Certified Fraud Examiner, for the purposes of analyzing the risk profile of PICA and comparing its risk profile with that of more suitable stewards for pension plan assets, using objective metrics and publicly available statutory financial statements ("Gober Decl."). The Gober Declaration was originally filed on September 5, 2025. ECF No. 1-1.

19. Plaintiffs maintain that Defendants ignored obvious red flags with respect to the scope and magnitude of PICA's reliance upon affiliates within the same controlled group. In so doing, Defendants failed to conduct a reasonably thorough and complete analysis of PICA's exposure to captive and affiliated reinsurers and the specific risks and liquidity implications for off-loaded plan participants. According to Mr. Gober, PICA is among the riskiest insurance companies in the pension risk transfer ("PRT") marketplace. Gober Decl. ¶ 36. It is not a suitable steward for Plan participants' pensions.

20. Information about PICA's exposure to affiliates can be readily obtained from its annual statutory financial statements that are filed in all U.S. jurisdictions where PICA transacts business. At a minimum, Defendants should have requested copies of statutory financial

---

whitepaper available for download at https://www.aon.com/insights/reports/2023/us-pension-risk-transfer-market-insights ("78% of the time, the lowest bidder was selected").

statements (which must be signed by top executives under penalty of perjury) that clearly detail affiliated party reinsurance and exposure to risky assets, including assets originated by affiliates. Had they done so, they would have realized that purchasing PICA issued group annuities for Plan participants was imprudent. If they did so, and chose PICA anyway, Defendants did so based on the cost savings and/or other financial benefits PICA offered to IBM and State Street out of self-interest, a course of action wholly inconsistent with the duties of loyalty that Defendants owed to the Plan participants under ERISA.

21.    In choosing PICA, Defendants have unwillingly imposed on Plaintiffs and the Class a material risk in violation of ERISA. Defendants' own financial interests were improperly served in violation of ERISA that required they choose the "**safest available**" annuity provider. 29 C.F.R. § 2509.95-1 (emphasis added).

22.    To remedy the breaches of fiduciary duties that led to the PICA deals, Plaintiffs, on behalf of themselves and all other individuals similarly situated, bring this action to obtain relief for Defendants' ERISA violations, including but not limited to:

- Damages under 29 U.S.C. § 1132(a)(9), measured by (i) the risk-adjusted economic value of the income stream between the PICA annuity that Plaintiffs and Class Members received and the value of an annuity from a reasonably safe, low-risk provider selected after a prudent and loyal annuity search (such as the safest available annuity), over the reasonable expected life of the entire cohort; or (ii) in the alternative, the risk-adjusted economic value of the income stream between the PICA annuity that Plaintiffs and Class Members received and the value of the ERISA protected pension benefits backed by the employer and by the PBGC that participants lost in the PRT with PICA, over the reasonable expected life of the entire cohort;

- Equitable relief under 29 U.S.C. § 1132(a)(3) and (a)(9), including but not limited to:

  o equitable surcharge, constructive trust, or disgorgement, of the difference between the cost of selecting PICA as the annuity provider and the cost of selecting a reasonably safe, low-risk provider selected after a prudent and loyal annuity search (such as

6

the safest available annuity);

o  payment of fixed rate PBGC premiums into a fund for the benefit of all impacted participants covering the time before an appropriate annuity is provided for the Plaintiffs and Class Members;

o  an order requiring Defendants to obtain appropriate reinsurance, security, surety bond or other credit support from a reputable, low risk annuity provider selected at arm's length through an appropriate process to backstop the group annuity contract purchased from PICA;

o  an order requiring Defendants to remain secondarily liable for Plaintiffs' pension benefits in the event of a PICA insolvency or impairment; or

o  injunctive relief to prevent IBM from holding the group annuity contract outside of the Plan and preventing IBM from depriving impacted retirees from ERISA's uniform and comprehensive protections.

## JURISDICTION AND VENUE

23.  The Court has federal subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims for relief arise under ERISA. 29 U.S.C. §§ 1001, *et seq*.

24.  Venue of this action lies in the District of Massachusetts, pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2), in that Defendant State Street maintains its principal place of business in this District, and Defendant IBM has substantial business operations in the District of Massachusetts.[6] In addition, the alleged breaches occurred in this district because many Class Members earned their pension benefits while working for IBM in the District of Massachusetts, the breach took place in this district, and this district is a convenient forum for all parties to resolve this dispute.

//

//

---

[6] IBM also has an office in Cambridge, MA. *See* https://ibm-zcouncil.com/venues/ibm-office-boston-ma-cambridge/.

## STANDING

25.    Plaintiffs have standing to bring this action based upon several distinct injuries-in-fact traceable directly to Defendants' conduct that can be fully remedied by a decision from this Court.

26.    The PICA annuitizations created a substantial risk of imminent harm that satisfies Article III. As described in detail below and in the attached Gober Declaration, PICA is a high-risk annuity provider likely to fail. *See, e.g.*, Gober Decl. ¶ 55 ("In 2024 alone, several life and annuity issuers were placed into rehabilitation or subjected to regulatory action …. These recent failures had two things in common[.]"). Should PICA fail, plan participants and beneficiaries like Plaintiffs will not receive the earned benefits to which they are entitled.

27.    Even if PICA does not fail immediately, the scope and magnitude of the affiliated party reinsurance exposure that PICA has with affiliates located in "regulation light" jurisdictions, and their high concentrations of high risk assets, make PICA a likely candidate right now for state regulatory action that would cause immediate disruptions or delays in periodic payments that Plaintiffs and Class Members expect to receive for the rest of their life and payments that Plaintiffs and Class Members plan to leave to their spouses and/or beneficiaries. *See* Gober Decl. ¶ 29.

28.    As noted in more detail below, affiliated party reinsurance, opaque modified coinsurance arrangements, and investments in affiliates led to a number of regulatory actions against other insurers in 2024 and 2025 that have already resulted in disruptions in payments to those insurer's policyholders. In the case of PHL Variable, the Connecticut Superior Court entered a Moratorium Order that immediately and significantly reduced policy benefits, withdrawals and death benefit payouts tied to Guaranty Association cap limits, discussed in greater detail *infra*. Disruptions and delays are likely to occur in other notable insurance company rehabilitation

proceedings, including the Rehabilitation of Columbian Mutual Life Insurance Company (NY) and its subsidiary Columbian Life Insurance Company (Illinois). No insurance company has ever been successfully "rehabilitated" in the State of New York. The Executive Life of New York ("ELNY") Rehabilitation lasted more than two decades and resulted in $920,000,000 in losses to annuitants when the longstanding rehabilitation was converted to a liquidation that became effective in 2012—decades after the events that led to the inevitable reduction in benefits occurred. ELNY was a subsidiary of the Executive Life Insurance Company, which, as discussed below, failed in 1991 due to disruptions in the junk bond market and the failure of Drexel Burnam & Lambert. The Executive Life companies also faced regulatory action in New York due to questionable reinsurance practices in Bermuda, and ELNY's attempt to solve their depleted surplus to satisfy the New York Insurance Commission through the use of Surplus Notes issued by affiliates to artificially bolster their surplus is similar to the high-risk practices identified in the Gober Declaration. *See* Gober Decl. ¶¶ 23-24, 43 (discussing how PICA's captive reinsurers are able to use surplus notes); *id.* ¶ 25 (discussing use of contingent or conditional instruments). Clearly, a disruption in pension payments constitutes Article III standing, and, as with Executive Life and the other insurers described in this paragraph, it is likely to occur with respect to PICA as it engages in the same kinds of risky practices.

29.    Plaintiffs' benefits have already been impaired by the loss of ERISA's uniform protections, including uniform and complete annual disclosures, uniform protections from creditor claims, ERISA's exacting fiduciary standards for Plan Fiduciaries, its funding requirements, and the backstop provided to all ERISA defined benefit plans by the PBGC.

30.    While the PBGC provides substantial lifetime payments to pensioners in the event of a plan failure that are uniform, no matter where pensioners reside, the state guarantee association

9

("SGA") safety net is non-uniform, coverage amounts vary state to state (as described in more detail below) and SGAs are limited by statute in their ability to assess their membership in the event of an insolvency event. This non-uniform treatment of policyholders has a chilling effect on retirees. It impacts decisions related to relocating to be closer to family members, it impacts quality of life, and it has already created fear that a once secure pension is no more.

31.      Plaintiffs have also suffered harm and are entitled to seek damages as measured by the difference in economic value of Plaintiffs' and putative Class Members' pension benefits before the PRT and after the PRT. Plaintiffs' benefits are worth significantly less today than they were immediately prior to the IBM annuitization transactions as a result of Defendants' improper and imprudent choice of PICA as steward for valuable pension assets. Plaintiffs will be able to quantify the value of their lost benefits through expert actuarial testimony at trial, and Plaintiffs will also be able to firmly establish that the transactions with PICA significantly and quantifiably reduced the value of his retirement security the moment the transactions occurred.

32.      Alternatively, Plaintiffs seek damages as measured by the difference between the cost of selecting PICA as the annuity provider and the cost of selecting the safest annuity available.

33.      As described in more detail below, Plaintiffs were significantly harmed by the fiduciary duty breaches by Defendants, which includes but is not limited to unwillingly imposing upon Plaintiffs the risk premium associated with Defendants' having selected PICA as a risky annuity provider. PICA's extensive affiliated-party transactions mask its true, financial conditions. Moreover, PICA is under-reserved and concentrates its investments in risky assets, which means that, in the event of insolvency, PICA would be unable to fulfill its obligations to pay Plaintiffs' hard-earned pension benefits.

34.      An analogy can be drawn by comparing annuities to bonds. Both provide a stream

10

of income, but there are important differences in safety and risk.

35.    A safe annuity is to a U.S. Treasury bond what PICA is to a junk bond. PICA is cheaper up front but riskier in the long run. This distinction matters to Plaintiffs but not Defendants.

36.    Simply stated, Plaintiffs pension benefits were worth substantially more before the PICA transactions than they are currently worth today.

37.    Should PICA fail, Plaintiffs' and Class Members' only recourse would be to pursue a claim as third-party beneficiaries of annuity contracts they did not negotiate or sign. But even this avenue for seeking relief might be foreclosed to them. Life insurance companies, or their estates in Rehabilitation, will claim that they do not owe Plaintiffs or Class Members any duty of care at all—let alone the highest fiduciary duty known to law that is a cornerstone of ERISA. Denial of a previously available right or remedy, including access to court, also sufficiently establishes standing under Article III.

## PARTIES

38.    **Plaintiff Richard Spohn** ("Plaintiff Spohn") is a citizen of California who resides in San Martin, California. Plaintiff Spohn is a "participant," as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the IBM Personal Pension Plan whose retirement benefits were annuitized in the 2022 transaction at issue in this case.

39.    Plaintiff Spohn began working at IBM in or around September 1974 as a junior programmer. During his 36.5 years at IBM, Plaintiff Spohn held many titles, including system programmer, software developer, business partner relationship manager, corporate security lead, and first line manager. Plaintiff Spohn retired from IBM in March 2011.

40.    PICA started making retirement benefit payments to Plaintiff Spohn on or around January 1, 2023.

11

41.    **Plaintiff Charles Lynch** ("Plaintiff Lynch") is a citizen of New York who resides in Poughkeepsie, New York. Plaintiff Lynch is a "participant," as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the IBM Personal Pension Plan whose retirement benefits were annuitized in the 2024 transaction at issue in this case.

42.    Plaintiff Lynch began working at IBM in or around June 1978 in the warehouse performing data processing. During his 34 years at IBM, Plaintiff Lynch worked in many capacities, including as a programmer, large systems marketing representative, inter-plant logistics, and finally in corporate audit and fraud investigations. Plaintiff Lynch retired from IBM in March 2012.

43.    PICA started making retirement benefit payments to Plaintiff Lynch on or around January 2, 2025.

44.    **Plaintiff Linnea Bei** ("Plaintiff Bei") is a citizen of California who resides in Elk Grove, California. Plaintiff is a "beneficiary," as defined by 29 U.S.C. § 1002(8), in the IBM Personal Pension Plan whose entitled retirement benefits were annuitized in the 2022 transaction at issue in this case.

45.    Plaintiff Bei's husband, Roy Bei, began working at IBM in 1962.

46.    During his 39 years at IBM, Mr. Bei was a computer programmer. Mr. Bei retired from IBM in 2001.

47.    Mr. Bei passed away in May 2016. Plaintiff Bei is the designated beneficiary who is entitled to her late husband's retirement benefits.

48.    PICA started making retirement benefit payments to Plaintiff Bei on or around January 1, 2023.

49.    **Plaintiff Arlene Crisafi** ("Plaintiff Crisafi") is a citizen of New York who resides

12

in Ridge, New York. Plaintiff is a "participant," as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the IBM Personal Pension Plan whose retirement benefits were annuitized in the 2022 transaction at issue in this case.

50.     Plaintiff Crisafi began working at IBM in 1981.  During her 13 years at IBM, Plaintiff Crisafi held various administrative positions, including Senior Administrative Specialist and Senior Administrator to the Northeastern Area Manager. Plaintiff Crisafi retired from IBM in or around November 1994.

51.     PICA started making retirement benefit payments to Plaintiff Crisafi on or around January 1, 2023.

52.     **Defendant International Business Machines Corp.** ("IBM Corp.") is incorporated in New York and has its principal place of business in Armonk, New York. IBM is a plan fiduciary because of its role in overseeing and appointing the other fiduciaries for the Plan. With respect to the transactions at issue, it acted as a fiduciary because it entered into a contract with PICA to purchase the group annuity.

53.     Defendant IBM Retirement Plans Committee (the "Committee," and, together with IBM Corp., "IBM") is listed as the Plan administrator in Form 5500 filings with the Department of Labor. As such, it is a named fiduciary, and it is responsible for the general administration of the Plan.

54.     Defendant State Street Global Advisors Trust Co. ("State Street," and, together with IBM, "Defendants") is a for-profit corporation with its principal place of business located at 1 Iron Street, Boston, Massachusetts 02210. State Street acted as the purported "independent fiduciary" with respect to the PICA annuity transactions and as such is a fiduciary with respect to its role in selecting PICA for the annuity transactions.

## FACTUAL ALLEGATIONS

**I.    Background on the Transfer of Pension Benefit Responsibilities to Insurance Companies**

55.    In a defined benefit pension plan, the plan sponsor (typically the employer) agrees to pay monthly pension benefits to retirees as they come due for the rest of the participants' lives, and it funds those benefits through assets contributed both initially and over time by the employer that are invested and held in trust for plan participants. The employer must pay the pension benefits, even if investment performance falls short of expectations.

56.    The employer must also make additional contributions to the Plan in accordance with ERISA's funding requirements, which demand additional plan contributions in certain circumstances, including if investment returns fall short of expectations and are insufficient to satisfy obligations to plan participants. Thus, the investment risk—the possibility that the plan's investments will generate insufficient returns to cover the plan's pension obligations and the expenses of operating the plan—is borne entirely by the plan sponsor.

57.    If the sponsor goes bankrupt or otherwise lacks the resources to continue to fund the Plan and pay required benefits, the PBGC—a wholly owned U.S. Corporation that administers an insurance program funded through annual premiums paid by all defined benefit pension plans or their sponsors—steps in as a backstop to pay benefits due.

58.    These features of defined benefit plans make them both valuable and predictable for retirees. Such plans once dominated the American retirement system because they were correctly seen as a way to attract and retain the best workforce.

59.    But because these plans are so valuable to employees, they are conversely expensive for employers. Consequently, as part of a recent trend by employers that sponsor defined benefit plans to improve their bottom lines, numerous sponsors have chosen to shift their liability

14

for monthly pension payments to some or all of the plan participants, to an insurance company through the purchase of group annuity contracts.

60.    The upside of such transactions—enjoyed by plan sponsors—is reduced costs[7] and tax benefits;[8] the downside—borne by plan participants—is the increased risk of losing promised retirement benefits because, if the annuity provider is unable to perform, the benefits are no longer guaranteed by their former employer and the PBGC.

61.    Although these transactions are now a common way for employers to diminish their defined benefit liabilities (and to profit from such transactions) or to dispense with defined benefit plans altogether, they are not new.

62.    In the 1980s, hundreds of employers terminated their well-funded, federally insured defined benefit pension plans and bought retirement annuities from a variety of insurance companies, including Executive Life Insurance Company ("Executive Life"), which was then one of the country's largest insurers, but which had embarked on a disastrous "junk bond" investment strategy.

63.    The pension benefits of approximately 84,000 workers and retirees were transferred from the federally regulated pension system to Executive Life.

64.    Executive Life was often selected by employers because it offered the lowest bid

---

[7] *See, e.g.*, Julie A. Su, *Department of Labor Report to Congress on Employee Benefits Security Administration's Interpretive Bulletin 95-1* (June 2024), U.S. DEP'T OF LABOR, at 5, https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/laws-secure-2.0/report-to-congress-on-interpretive-bulletin-95-1.pdf ("[P]lan sponsors have several reasons for engaging in pension risk transfers. Some may want to **avoid or reduce the cost** of maintaining the plan, the administrative responsibilities, or the impact and uncertainty that the plan's funding may have on the contributing employers' corporate balance sheets. ... Another reason plan sponsors may consider pension risk transfer is to **avoid or reduce the cost** of premiums payable to the Pension Benefit Guaranty Corporation (PBGC).") (emphasis added) (internal citation omitted).

[8] *See infra* ¶ 182.

on group annuity contracts.[9] Rather than choose a safer, more expensive annuity, employers placed their own financial interests over plan participants' needs.

65.    Those decisions proved disastrous when, in 1991, Executive Life became insolvent. A significant portion of its assets had been invested in high-risk, high-yield bonds procured through the Drexel Burnham Lambert ("Drexel") investment bank, which then failed due to its risky bond strategy.

66.    The failure of Drexel led to Executive Life defaulting on its annuity contracts, thereby failing to make good on its obligations to tens of thousands of pension annuitants. State regulators were required to seize the company in April 1991 to prevent a run. The debacle resulted in massive losses to pensioners and total losses to policy holders were estimated in the billions of dollars.[10]

67.    Members of Congress were outraged by Executive Life's implosion and its impact on retirees. In response, they enacted the Pension Annuitants Protection Act of 1994, Pub. L. No. 103-401 (Oct. 22, 1993) ("PAPA"), as an amendment to ERISA in order to prevent similar crises and ensure that plan participants would have legal recourse against risky pension transfers by plan fiduciaries.[11] Through this amendment, ERISA now provides expressly that plan participants and

---

[9] *See*, *e.g.*, *Pilkington PLC v. Perelman*, 72 F.3d 1396, 1397 (9th Cir. 1995) ("Of the four carriers that eventually submitted bids, **Executive Life submitted the lowest by over $13 million**.") (emphasis added) (finding that ERISA allowed pension plan fiduciaries to sue a predecessor plan's fiduciaries for losses incurred as a result of Executive Life's collapse).

[10] *See, e.g.*, Lisa Girion, *'Little People Floundering' From Executive Life Losses*, LA TIMES (Apr. 28, 2002), available at https://www.latimes.com/archives/la-xpm-2002-apr-28-fi-execlife28-story.html ("The Executive Life debacle has become a morass of insurance and banking laws and complex international investment deals. Lost in all the legal battles is the fact that thousands of policyholders are out billions of dollars.").

[11] *See, e.g.*, 3 ERISA PRACTICE AND PROCEDURE § 8:92 ("ERISA was amended by the Pension Annuitants Protection Act of 1994, which amended ERISA by adding § 502(a)(9) to clarify that former participants or beneficiaries of terminated pension plans have standing to seek relief where, as here, a fiduciary breach has occurred involving the purchase of insurance contracts or annuities in connection with their termination as plan participants."); *see also Kayes v. Pac.*

beneficiaries ejected from the federal pension regulatory system by a plan sponsor's purchase of annuities may sue for relief to, *inter alia*, assure the receipt of the benefits to which they are entitled. 29 U.S.C. § 1132(a)(9).

68.    And in 1995, the Department of Labor ("DOL") promulgated Interpretive Bulletin 95-1, 29 C.F.R. § 2509.95-1 ("IB 95-1"), which—like PAPA—aimed to prevent the irresponsible and therefore imprudent transfer of pension liabilities to insurance companies that are not sufficiently secure to guarantee retirement benefits, a principal animating force behind the enactment of PAPA and indeed ERISA itself. IB 95-1 has since been updated, consistent with that purpose.

69.    IB 95-1 provides courts, regulated entities, and the public with the DOL's expert guidance on the fiduciary standards that apply under ERISA to the selection of an annuity provider when a fiduciary transfers defined benefit pension liabilities to an annuity provider. *See* IB 95-1(a).

70.    It explains that selecting an annuity provider is a fiduciary decision under ERISA, 29 U.S.C. § 1104(a), and that employers therefore must act solely in the interest of the plan's participants and beneficiaries and in accordance with ERISA's strict prudence standard when selecting an annuity provider. IB 95-1(b) (citing 29 U.S.C. § 1104(a)).

71.    Thus, to meet their loyalty and prudence obligations in selecting an annuity provider, fiduciaries must obtain the "safest annuity available," unless good and substantial reasons dictate that a different (but safe) annuity better serves plan participants and beneficiaries. IB 95-1(c), (d). "[I]ncreased cost or other considerations could **never** justify putting the benefits

---

*Lumber Co.*, 51 F.3d 1449 (9th Cir. 1995) ("Accordingly, under ERISA § 502(a)(9), 29 U.S.C. § 1132(a)(9), Plaintiffs have standing to sue for 'appropriate relief, including the purchase of a back-up annuity to remedy the breach.'") (internal citations omitted).

of annuitized participants and beneficiaries at risk by purchasing an unsafe annuity," and fiduciaries "may have to condition the purchase of annuities on additional employer contributions sufficient to purchase the safest available annuity." IB 95-1(d) (emphasis added). Fiduciaries must also, at a minimum, "**conduct an objective, thorough and analytical search for the purpose of identifying and selecting providers from which to purchase annuities.**" IB 95-1(c) (emphasis added).

72.     In performing that analysis, plan fiduciaries must consider "a number of factors relating to a potential annuity provider's claims paying ability and creditworthiness[,]" and "[r]eliance solely on ratings provided by insurance rating services would not be sufficient to meet this requirement." *Id.* For example, fiduciaries may consider:

> (i)     the quality and diversification of the annuity provider's investment portfolio;
>
> (ii)    the size of the insurer relative to the proposed contract;
>
> (iii)   the level of the insurer's capital and surplus;
>
> (iv)    the lines of business of the annuity provider and other indications of an insurer's exposure to liability;
>
> (v)     the structure of the annuity provider and other indications of an insurer's exposure to liability;
>
> (vi)    the availability of additional protection through state guaranty associations and the extent of their guarantees.

29 CFR § 2509.95-1(c).

73.     Moreover, in June 2024, the DOL's Employee Benefits Security Administration ("EBSA") "conducted more than 40 stakeholder meetings regarding the Interpretive Bulletin"[12] and reported its findings to Congress.

74.     In its report to Congress, the EBSA noted stakeholder concern among topics

---

[12] Julie A. Su, *Department of Labor Report to Congress on Employee Benefits Security Administration's Interpretive Bulletin 95-1*, at 2.

including, *inter alia*, surplus, risky investment strategies,[13] the increasing involvement of private equity,[14] reinsurance and modified coinsurance,[15] insufficient disclosures pertaining to partial buy-out transactions,[16] and, notably, the loss of PBCG protections.[17]

75.     In the report, EBSA council members provided recommendations the DOL take with respect to updating and/or amending IB 95-1, including:

> One member of the Council recommends DOL update 95-1 to provide for the **consideration of additional factors in assessing an annuity provider's level of capital and surplus** as it relates to its claims paying ability and creditworthiness.
>
> DOL should update IB 95-1 to provide that in evaluating a potential annuity provider's level of capital and surplus, as well as its claims paying ability and creditworthiness, a fiduciary should evaluate additional issues, including the insurer's **risk-based capital (RBC) ratio; how reinsurance or modified coinsurance agreements with offshore affiliates or affiliates in states that have less strict requirements than the majority of U.S. states might affect the reported ratio**, especially with respect to significant allocation of their investment portfolios to alternative investments that come with greater risk; and whether the insurer is properly reserved under statutory accounting principles ("SAP").[18]

76.     These concerns—including but not limited to the insurer's level of surplus, claims-paying ability, risk-based capital ratio, reinsurance and modified coinsurance, non-traditional liabilities, and loss of PBGC protections—are all present in the IBM/PICA transaction.

77.     Defendants should have taken additional care in selecting PICA, in light of the fact that PICA's parent company had—just months prior to the transaction—settled a $35 million lawsuit alleging that it "**hid mortality trends and understated its life insurance reserves**,

---

[13] *Id.* at 11-14.

[14] *See generally id.*

[15] *Id.* at 17-18.

[16] *Id.* at 23-24.

[17] *Id.* at 24-25.

[18] *Id.* at 12 (emphasis added).

causing its stock to trade at inflated prices."[19] This lawsuit had been filed years before the transactions at issue (and settled months before the 2024 transaction), so Defendants should have been aware of this litigation.[20]

78.     The plaintiffs in that case alleged, *inter alia*, that "[PRU] stated that current reserves were likely to be greater than necessary, thus falsely suggesting that its income and financial strength may be understated[.]" No. 2:19-cv-20839, ECF No. 22, at ¶ 8 (citing 2018 Form 10-K).

79.     The plaintiffs also alleged "the Company's earnings were overstated and liabilities understated, undermining the Company's guidance and ability to drive growth going forward." *Id.* ¶ 16.

80.     Likewise, here, Plaintiffs allege that PICA engages in practices that impact its ability to come up with liquidity and make good on its obligations. PICA's strength may be overstated and its liabilities understated due to, *inter alia*, PICA's use of captive reinsurers in secrecy jurisdictions, PICA's broad exposure to pension risk transfers generally, the fact that PICA and its insurer affiliates hold excessive concentrations of higher-risk, less liquid investments, and because PICA has billions of dollars of investments in affiliates. *See, e.g.*, Gober Decl. ¶ 69 ("Especially troubling are their concentrations of commercial mortgages, Schedule BA 'Other LT Invested Assets' and 'other Loan-Backed & Structured Securities.'"); *see also id.* ¶¶ 19, 39, 64.

## II.    The Annuity Transactions at Issue

---

[19] Henrik Nilsson, *Prudential Inks $35M Deal Over Investor's Stock-Drop Suit*, LAW360 (Feb. 14, 2024), https://www.law360.com/articles/1803134 (emphasis added).

[20] *See generally City of Warren Police and Fire Retirement System v. Prudential Financial, Inc. et al.* ("*City of Warren*"), No. 2:19-cv-20839 (D.N.J. Nov 27, 2019); *see also City of Warren*, Order Awarding Attorneys' Fees and Expenses ¶ 6, ECF No. 78 ("The Settlement has created a fund of $35,000,000 in cash, ...").

81.    On September 13, 2022, IBM reported as follows in a Form 8-K[21] filed with the

United States Securities and Exchange Commission ("SEC"):

**Item 8.01. Other Events.**

On September 7, 2022, International Business Machines Corporation ("IBM" or the "Company") and State Street Global Advisors Trust Company, as independent fiduciary of the IBM Personal Pension Plan (the "Plan"), entered into two separate commitment agreements, one with The Prudential Insurance Company of America ("Prudential") and one with Metropolitan Life Insurance Company (collectively, the "Insurers") under which the Plan agreed to purchase nonparticipating single premium group annuity contracts that will transfer to the Insurers approximately $16 billion of the Plan's defined benefit pension obligations related to certain pension benefits that began to be paid prior to 2016.

The purchase of the group annuity contracts closed on September 13, 2022. The contracts cover approximately 100,000 IBM participants and beneficiaries (the "Transferred Participants"). Under the group annuity contracts, each Insurer has made an irrevocable commitment, and will be solely responsible, to pay 50% of the pension benefits of each Transferred Participant that are due on and after January 1, 2023. Prudential will be the lead administrator. The transaction will result in no changes to the amount of benefits payable to the Transferred Participants.

The purchase of the group annuity contracts was funded directly by assets of the Plan and required no cash or asset contributions of the Company. As a result of the transaction, the Company expects to recognize a one-time non-cash pre-tax pension settlement charge of approximately $5.9 billion ($4.4 billion net of tax) in the third quarter of 2022. The actual charge will depend on finalization of the actuarial and other assumptions. The pre-tax charge was not included in the GAAP forward-looking information released on July 18, 2022. This charge will not impact the Company's third quarter or full year 2022 operating (non-GAAP) profit or free cash flow.

82.    Similarly, on September 11, 2024, IBM reported as follows in a Form 8-K[22]:

**Item 8.01. Other Events.**

On September 5, 2024, International Business Machines Corporation ("IBM" or the "Company") and State Street Global Advisors Trust Company, as independent fiduciary of the IBM Personal Pension Plan (the "Plan"), entered into a commitment agreement with The Prudential Insurance Company of America ("Prudential") under which the Plan will purchase a nonparticipating single premium group annuity contract that will transfer to Prudential approximately $6 billion of the Plan's defined benefit pension obligations related to certain pension benefits that began to be paid prior to 2016.

The purchase of the group annuity contract closed on September 11, 2024. The contract covers approximately 32,000 Plan participants and beneficiaries (the "Transferred

---

[21]

https://www.sec.gov/ix?doc=/Archives/edgar/data/0000051143/000110465922099631/tm2225734d1_8k.htm

[22] https://www.sec.gov/Archives/edgar/data/51143/000110465924098942/tm2423753d1_8k.htm

Participants"). Under the group annuity contract, Prudential has made an irrevocable commitment, and will be solely responsible, to pay the pension benefits of each Transferred Participant that are due on and after January 1, 2025. The transaction will result in no changes to the amount of benefits payable to the Transferred Participants.

The purchase of the group annuity contract was funded directly by assets of the Plan and required no cash contribution from the Company. As a result of the transaction, the Company expects to recognize a one-time non-cash pre-tax pension settlement charge of approximately $2.7 billion ($2.0 billion net of tax) in the third quarter of 2024. The actual charge will depend on finalization of the actuarial and other assumptions. The pre-tax charge was not included in the GAAP forward-looking information released on July 24, 2024. This charge will not impact the Company's third quarter or full year 2024 operating (non-GAAP) profit or free cash flow.

83.     As a result of these transactions with PICA, 132,000 retirees will not receive pension benefits promised by IBM. Instead, PICA is now responsible for these pension benefits.

84.     The IBM/PICA transactions were neither prudent nor loyal and, as such, they undermined the protective scheme set up by Congress in ERISA. These transactions eliminated IBM's obligations to pay many millions of dollars in annual premiums to the PBGC and placed the retirees in an inferior and non-uniform state regulated regime that only offers minimal protections through state guaranty associations ("SGAs"), which apply based on the state in which the annuitants reside. These SGAs do not provide retirees with nearly as much uniform protection in the event of insolvency by PICA as does the PBGC under the federal ERISA-governed system, and most of them are not pre-funded and can only seek contributions from insurers in their state based on the amount of premium written in any given year.[23] Prior to the 2022 transaction, Plaintiffs and all putative Class Members had Plan benefits that were insured or guaranteed by the federal PBGC at age 65 up to the annual limit of approximately $74,454.60 for a single life annuity

---

[23] *See, e.g.*, NY DEP'T OF FIN. SERVICES, *Guaranty Fund Protection in New York State* https://www.dfs.ny.gov/consumers/health_insurance/financial_stability_and_the_department_of _financial_services (last retrieved on July 26, 2025) ("The [New York] Guaranty Fund is funded through assessments against member insurers made after a member insurer is declared insolvent by a court of law. These funds are used to pay valid claims, as well as administrative expenses.").

(for the participant alone) and $67,009.20 for a joint and 50% survivor annuity (which continues to provide benefits to surviving spouses for their lifetimes). These limits are per year, per retiree and that annual protection is for an unlimited number of consecutive years.[24] For a plan participant age 75, that coverage amount increases to $226,341.96 per year for a straight life annuity and $203,707.80 for joint and 50% survivor annuity as the protected annual PBGC benefit limit is much higher for older retirees and PBGC benefits increase as a function of age, unlike state guaranty association coverage limits which are per individual, per lifetime and wholly unsuitable for annuities that are generally paid out monthly over many years. Once Plaintiffs and putative Class Members were removed from the Plan and transferred by IBM to PICA, they lost all federal PBGC protections which were replaced by the insufficient and varying state guaranty coverage amounts determined by the retirees' state of residence at the time of the insurance company insolvency or impairment. The amount of state guaranty coverage usually ranges from $250,000 to $500,000 per individual, per lifetime depending upon the state of residency of the retiree at the time of insolvency or impairment of the annuity provider as determined under non-uniform state insurance laws.

85.    Life expectancy is a range—not a date. As life expectancy continues to increase, the actual duration over which annuities like PICA must make payments to certificate holders like Plaintiffs can be much longer than anticipated. This can present major issues down the road. The following example is illustrative:

> Mr. Ponzi recommends that a plan fiduciary purchase an annuity contract from Joe's Bar and Grill. Joe's Bar and Grill only has enough cash to make payments for 10 years before it defaults.

---

[24] *See* PBGC, MAXIMUM MONTHLY GUARANTEE TABLES, https://www.pbgc.gov/wr/benefits/guaranteed-benefits/maximum-guarantee (last accessed Aug. 1, 2025).

86.     In this example, ten years is not tomorrow. But forcing retirees to inadequate, lower means of subsistence in their later years is inconsistent with their hard-earned pension benefits that ERISA was designed to protect.

87.     Moreover, delays and reductions in payments from SGAs in the event of insolvency or impairment is highly likely. This is because SGAs are funded through assessments of the member insurance companies. Most guaranty associations limit the amount of assessments authorized under the relevant Guaranty Association statute to a small percentage[25] of a member insurer's average annual premiums received in their state of domicile during recent years.[26] And SGAs have never been tested with the failure of an annuity provider as large as PICA. Despite being a fraction the size of PICA, the Executive Life of New York rehabilitation lasted more than two decades and resulted in $920,000,000 in losses to annuitants.

88.     IBM retirees and their spouses and beneficiaries, especially those residing in states with the lowest protection levels, were immediately harmed by receiving unsafe and inappropriate annuities that are worth far less than available annuities that were safe and appropriate. Indeed, some would be left with less than two years of pension replacement coverage in the event of a liquidation of PICA. And this harm is not theoretical given the risky nature of PICA, which, as discussed next, is dramatically under-reserved and has concentrated investments in affiliated risky

---

[25] *E.g.*, 2%. *See, e.g.*, Cal. Ins. Code § 1067.08 ("[T]he total of all assessments authorized by the association with respect to a member insurer for each subaccount of the life insurance and annuity account and for the health account *shall not in one calendar year exceed 2 percent* of that member insurer's average annual premiums received in this state….") (emphasis added).

[26] *See* AMERICAN COUNCIL OF LIFE INSURERS, *Insurance Guaranty Associations: Frequently Asked Questions* (June 2010), at https://www.acli.com/-/media/acli/public/files/pdfs-public-site/public-public-policy/guarantee-associations-faq.pdf ("These assessments (together with the assets of the insurer) are then used to pay, *up to statutory limits*, the covered claims of policyholders of the insolvent company. ... These assessments are based on each member's share of premium during the *prior three years*.") (emphasis added).

assets and exposure to affiliated reinsurers that hide its true financial condition.

89.     Moreover, inferior coverage limits in the event of an insurance company insolvency create immediate, genuine and substantial economic harm for retirees. It influences retirees' quality of life, the ability to relocate to be closer to family members in other states, investment decisions involving other assets, and retiree healthcare choices and treatment. All of these lost benefits can be readily ascertained and quantified by experts.

90.     By way of example, Plaintiff Spohn's pension was fully protected by the PBGC before his pension was offloaded to PICA in September of 2022. Prior to the transaction, no matter how long Mr. Spohn lives, there are no realistic scenarios where he would have his pension benefits reduced, even in the event that IBM goes out of business and the PBGC takes over the pension plan. If PICA were to fail on the other hand, and Mr. Spohn remained a California resident at the time of PICA's failure and had to depend upon the California Life and Health Insurance Guaranty Association for payment, the maximum amount of coverage he would be entitled to is 80% of $250,000 or $200,000 and that amount would only be paid out following a final order of Liquidation. That is approximately $216,000 less than the dollar amount of payments he is expected to receive over his lifetime based on his life expectancy taken directly from the Social Security Administration life expectancy tables.[27] Given this quantifiable shortfall, the loss of PBGC protection is a real and tangible harm for Mr. Spohn and others impacted by the annuitization transactions at issue in this case.

91.     The impact on Mr. Spohn gets worse if he lives beyond his life expectancy, as his benefits are capped under state law while they would have been uncapped under ERISA.

---

[27] *See* https://www.ssa.gov/cgi-bin/longevity.cgi (13 years from the date of this complaint x approximately $32,000 annual pension = $416,000).

92.     Even aside from lifetime limits, retirees like Mr. Spohn, located in California, lose **20% of the present value of their coverage amount** immediately following any declaration of insolvency or impairment. Cal. Ins. Code § 1067.02. Thus, in California, **coverage is never 100% of the value of the annuity but is limited to 80% of the present value of the annuity contract** up to a maximum of $250,000. Cal. Ins. Code § 1067-1067.18.[28]

93.     In addition to the immediate loss of PBGC coverage, as a result of the IBM/PICA transactions, Plaintiffs and all other impacted retirees lost all of their uniform ERISA protected rights, including mandated annual financial disclosures, the ability to sue in federal court under a protective federal scheme that imposes exacting fiduciary duties on the company and others who manage the Plan and its assets, and a claims procedure that must be "full and fair."[29] PICA is not required to disclose to any transferred retiree how his or her annuity funding is invested and who is in charge of the underlying investments. Nor is PICA required to explain the impact of all of the affiliated party transactions on PICA's reserves. On the contrary, PICA's reinsurance transactions with its captive and offshore affiliates and reinsurers are all secret.

94.     The IBM/PICA transactions are not what Plaintiffs and the potential class of retirees bargained for when they loyally served IBM. If their benefits were replaced by annuities, they had the right under ERISA and its implementing regulations to expect that these annuities would be the safest available and selected prudently and loyally. The involuntary removal of

---

[28] *See also FAQs*, CALIFORNIA LIFE & HEALTH INSURANCE GUARANTEE ASSOCIATION, https://www.califega.org/FAQ/Print ("Present value of annuity benefits including net cash surrender and net cash withdrawal values: 80% of the present value up to a maximum of $250,000.").

[29] "Section 503 of ERISA requires plans to set up procedures to provide a full and fair review of denied benefit claims." US DEP'T OF LABOR (EBSA), BENEFIT CLAIMS PROCEDURE REGULATION FAQs, https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/benefit-claims-procedure-regulation.

Plaintiffs and the putative class of retirees from the Plan and transfer to PICA is not in Plaintiffs' and putative Class Members' best interests because the group annuity contracts were risky and therefore imprudent, as discussed next.

### III.    IBM's and State Street's Choice of PICA was Imprudent

95.     Even a cursory review of PICA's statutory filings reveals a shocking dependence on affiliated party transactions with wholly owned affiliates and captive reinsurers and affiliates in Bermuda. In SCHEDULE S - PART 3 - SECTION 1 of PICA's 2023 annual statement, PICA reports all of its ceded[30] reinsurance with affiliates and its opaque Modified Co-insurance ("ModCo") transactions with affiliates, described in detail herein. As set forth in the chart directly below, PICA reported liabilities offloaded (via reinsurance or ModCo) to wholly owned captives and affiliates in the amount of $72,884,344,104 as of December 31, 2023.

//

//

//

//

//

//

//

//

//

---

[30] "Reinsurance ceded is the action taken by an insurer to pass off a portion of its obligation for coverage to another insurance company. … Reinsurance assumed is the acceptance of that obligation by another insurance company." Caroline Banton, *Reinsurance Ceded: Definition, Types, Vs. Reinsurance Assumed*, INVESTOPEDIA (last updated Mar. 27, 2022), https://www.investopedia.com/terms/r/reinsurance-ceded.asp.

ANNUAL STATEMENT FOR THE YEAR December 31, 2023 OF THE The Prudential Ins Co Am (NAIC #68241)

**SCHEDULE S - PART 3 - SECTION 1**

**Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities**

| | Reserve Credit Taken | Modified Coinsurance Reserve |
|---|---|---|
| General Account - Authorized - Affiliates US - Captive | 0 | 0 |
| General Account - Authorized - Affiliates US - Other | 59,576,712,067 | 0 |
| General Account - Authorized - Affiliates Non-US - Captive | 0 | 0 |
| General Account - Authorized - Affiliates Non-US - Other | 0 | 0 |
| **General Account - Authorized - Affiliates - Total** | **59,576,712,067** | **0** |
| General Account - Unauthorized - Affiliates US - Captive | 7,498,417 | 0 |
| General Account - Unauthorized - Affiliates US - Other | 0 | 0 |
| General Account - Unauthorized - Affiliates Non-US - Captive | 0 | 0 |
| General Account - Unauthorized - Affiliates Non-US - Other | 2,292,791,790 | 11,007,341,830 |
| **General Account - Unauthorized - Affiliates - Total** | **2,300,290,207** | **11,007,341,830** |
| Total US | 59,584,210,484 | 0 |
| Total Non-US | 2,292,791,790 | 11,007,341,830 |
| **TOTAL** | **$61,877,002,274** | **$11,007,341,830** |
| **TOTAL Res Cr + ModCo:** | **$72,884,344,104** | |

Gober Decl. ¶ 15.

96.     $72.8 billion in affiliated party reinsurance and ModCo is especially shocking when compared to PICA's surplus, which is not only a measure of the risk associated with the annuitized pensions, but **surplus is the only buffer protecting policyholders if PICA becomes insolvent or impaired**. As set forth in the chart on the following page, as of December 31, 2023, PICA had a mere surplus of $16 billion. This means that if even a portion of the $72.8 billion in affiliated party reinsurance and ModCo is problematic, PICA will face extreme liquidity and solvency concerns.

//

//

//

//

//

28





Gober Decl. ¶ 16.

97.    In addition to the credit for reinsurance that PICA has taken through non-arm's

length transactions with affiliates, SCHEDULE S - PART 1 - SECTION 1 of PICA's own statutory

financial statement shows all reinsurance assumed by PICA from its own affiliates. When PICA

assumes reinsurance from an affiliate, it agrees to take financial responsibility for certain

specified liabilities owed by those affiliates. The following chart was prepared using data from

PICA's 2023 Annual Statement, and it lists all reinsurance assumed by PICA from its affiliates

including captives, U.S. affiliates, and non-U.S. affiliates as of December 31, 2023.

//

//

//

//

//

ANNUAL STATEMENT FOR THE YEAR December 31, 2023 OF THE The Prudential Ins Co Am (NAIC #68241)

**SCHEDULE S - PART 1 - SECTION 1**

**Reinsurance Assumed Life Insurance, Annuities, Deposit Funds and Other Liabilities**

| | Reserve | Reinsurance Payable on Paid and Unpaid Losses | Modified Coinsurance Reserve |
|---|---|---|---|
| General Account - Affiliates - US - Captive | 3,155,064,916 | 622,762,989 | 0 |
| General Account - Affiliates - US - Other | 470,381,323 | 31,402,000 | 0 |
| General Account - Affiliates - Non-US - Captive | 0 | 0 | 0 |
| General Account - Affiliates - Non-US - Other | 32,759,385,557 | 354,784,712 | 0 |
| **General Account - Affiliates - Total** | **36,384,831,796** | **1,008,949,701** | **0** |
| Separate Accounts - Affiliates - US - Captive | 0 | 0 | 0 |
| Separate Accounts - Affiliates - US - Other | 0 | 0 | 9,353,477,066 |
| Separate Accounts - Affiliates - Non-US - Captive | 0 | 0 | 0 |
| Separate Accounts - Affiliates - Non-US - Other | 0 | 0 | 0 |
| **Separate Accounts - Affiliates - Total** | **0** | **0** | **9,353,477,066** |
| General Account & Separate Accounts - US | 3,625,446,239 | 654,164,989 | 9,353,477,066 |
| General Account & Separate Accounts - Non-US | 32,759,385,557 | 354,784,712 | 0 |
| **TOTAL** | **$36,384,831,796** | **$1,008,949,701** | **$9,353,477,066** |
| **TOTAL Res + Reins Payable + ModCo:** | **$46,747,258,563** | | |

Gober Decl. ¶ 17.

98.    The bar graph below compares PICA's assumed reinsurance of $46.7 billion, with its surplus of only $16 billion.

//

//

//

//

//

//

//

//

//

//

30



Gober Decl. ¶ 18.

99.     In addition to PICA taking billions of dollars in credit for reinsurance that it ceded to affiliates and in addition to PICA assuming billions in reinsurance obligations from its own affiliates, PICA affiliates, including Pruco Life Insurance Company (AZ) ("Pruco Life") have likewise ceded billions in liabilities to the secret captive reinsurers domiciled in Arizona that are wholly owned by PICA itself. *See* Pruco Life's reported reinsurance ceded totals from their sworn annual statement for year-end 2023, in particular SCHEDULE S - PART 3 - SECTION 1, highlighted in the chart set forth below.

//

//

//

//

//

ANNUAL STATEMENT FOR THE YEAR December 31, 2023 OF THE Pruco Life Insurance Co (NAIC #79227)

**SCHEDULE S - PART 3 - SECTION 1**

**Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities**

| | Reserve Credit Taken | Modified Coinsurance Reserve |
|---|---|---|
| General Account - Authorized - Affiliates US - Captive | 45,704,022,380 | 0 |
| General Account - Authorized - Affiliates US - Other | 83,080,596 | 0 |
| General Account - Authorized - Affiliates Non-US - Captive | 0 | 0 |
| General Account - Authorized - Affiliates Non-US - Other | 0 | 0 |
| **General Account - Authorized - Affiliates - Total** | **45,787,102,976** | **0** |
| General Account - Unauthorized - Affiliates US - Captive | 0 | 0 |
| General Account - Unauthorized - Affiliates US - Other | 0 | 0 |
| General Account - Unauthorized - Affiliates Non-US - Captive | 0 | 0 |
| General Account - Unauthorized - Affiliates Non-US - Other | 1,820,590,176 | 12,586,961,064 |
| **General Account - Unauthorized - Affiliates - Total** | **1,820,590,176** | **12,586,961,064** |
| Total US | 45,787,102,976 | 0 |
| Total Non-US | 1,820,590,176 | 12,586,961,064 |
| **TOTAL** | **$47,607,693,152** | **$12,586,961,064** |
| TOTAL Res Cr + ModCo: | $60,194,654,216 | |

Gober Decl. ¶ 19.

100.    While Pruco Life depends upon PICA's wholly owned captives for more than $60 billion in liabilities, Pruco Life's total surplus as of December 31,2023 was only $5.16 billion. Said another way, if PICA's wholly owned captives cannot make good on their IOU's to Pruco Life, Pruco Life's surplus will be entirely wiped out. This is demonstrated in the chart below.

//

//

//

//

//

//

//

//



Gober Decl. ¶ 20.

101.    In addition to all of the liabilities ceded to the secret captives by PICA, Pruco Life is also owed more than $60 billion from PICA's wholly owned Arizona captives and affiliates, most of which PICA values at zero.[31] This type of financial alchemy and circular non-arm's length reinsurance among affiliates within the same controlled group exposes Class Members to significant and quantifiable risk of losing their hard-earned pension benefits that far exceeds the risk of loss that they would have if IBM had purchased a group annuity with an appropriate and more transparent insurer. *See* Gober Decl. ¶ 54 ("I am confident that PICA's statutory surplus is significantly overstated when considering the exposure PICA has to Pruco Life …").

102.    In addition to the circular movement of liabilities among affiliates, PICA's

---

[31] *See infra* ¶ 133 (evidencing that PICA values the captives at zero).

affiliated captive reinsurers in Arizona all count surplus notes or other debt-like financing instruments as assets, a practice that understates the liabilities of the captives. Yet, as reported in the State of New Jersey Report on Group-Wide Examination of Prudential Financial, Inc., a report filed on June 26, 2023, **all seven (7) Arizona captive reinsurance companies owned 100% by PICA (the "Arizona Captives") employ this practice** to prop up their financial statements funding "the assets supporting the non-economic reserves it retains with proceeds from the issuance of surplus notes or other financing instruments." Gober Decl. ¶ 23.

103.    Surplus notes are debt instruments that are subordinated to policyholder claims.[32] Yet, all of the AZ Captives report their surplus notes as "assets," including credit linked surplus notes,[33] which are really debt instruments attached to a derivative contract.

104.    PICA's Arizona Captives also count conditional letters of credit and parental guarantees as assets. These types of conditional instruments could never be reported as "admitted assets" at a regulated U.S. based primary insurance company due to their conditional nature. *See* Gober Decl. ¶ 43.

105.    The ability of PICA's wholly owned affiliates to make good on their insider reinsurance "IOUs" is entirely speculative and opaque because PICA's captives do not make their financials publicly available. *See* Gober Decl. ¶ 26; *see also id.* ¶ 38.

106.    PICA has excessive exposure to ModCo transactions with those same affiliates and captives. In a typical arm's length reinsurance contract, an insurance company like PICA transfers

---

[32] *See, e.g.*, *GAAP & SAP Surplus Notes*, JONSONLAMBERT CPAS + CONSULTANTS, https://ondemandlearning.johnsonlambert.com/gaap-sap-surplus-notes/ ("Surplus notes are a form of unsecured debt that is subordinated to all claims by policyholders and creditors.").

[33] "Surplus notes issued pursuant to ARS § 20-725 are to be reported as surplus items in the capital section rather than a liability in accordance with GAAP[.]" ARIZONA CAPTIVE INSURER REFERENCE GUIDE (Feb. 2022), https://difi.az.gov/sites/default/files/CID%20RefGuide_NonRRG%2002%202022.pdf.

a portion of its liabilities and some of the associated assets to a reinsurance company. PICA remains liable to its policyholders but can claim against the reinsurer if certain agreed upon triggers are reached. With ModCo on the other hand, an insurance company like PICA keeps both the assets and all of the liabilities associated with certain blocks of business and only transfers risk and regulatory capital requirements to its reinsurer. As a consequence, PICA which has substantial ModCo exposure to affiliates, holds much less capital in the form of reserves than insurance companies that do not use ModCo—all other things being equal. ModCo also enables the ceding insurer to transfer asset risk to the reinsurer even though the assets themselves are held in a trust account under the control of the ceding insurer. This allows **ceding insurers like PICA to artificially inflate their risk-based capital ("RBC") ratios** – a metric prescribed by the National Association of Insurance Commissioners ("NAIC") to impose safe capital requirements on all insurance companies in order to avoid regulatory action and protect against insolvency. The RBC system calculates the amount of capital that an insurance company needs to hold to support asset risk, interest rate risk, insurance risk and other risks. Asset risk carries substantial weight in the RBC calculation. A high RBC ratio means that an insurance company is well capitalized; **a low RBC ratio can trigger regulatory action**. Because of PICA's ModCo transactions, a significant component of the investment risk associated with risky assets like junk bonds, collateralized debt obligations ("CDOs") collateralized loan obligations ("CLOs"), illiquid private debt or commercial real estate is transferred to their affiliated reinsurers and does not factor into their RBC calculations. As a result, PICA reports a higher RBC ratio than it would otherwise be required to report if the risky assets artificially off-loaded via ModCo transactions with its own wholly owned affiliates were included in its RBC calculations. *See* Gober Decl. ¶ 28.

35

107.    As noted by the authors of *Regulatory Capital and Asset Risk Transfer*, published in the Journal of Risk and Insurance in June 2023, "modified coinsurance allows insurers to report higher risk-based capital ratios" and "ModCo improves the RBC ratio of the ceding insurer because: (i) the ceding commission increases the level of capital, and (ii) the investment risk component of RBC decreases."[34] But the actual financial condition of the insurer has not improved. The authors also compare ModCo to interest rate swaps: "ModCo contracts are similar to interest rate swaps wherein the 'risk' transfers to the counterparty but not the underlying assets and liabilities."[35]

108.    An ERISA fiduciary should know that excessive exposure to ModCo with an affiliate is a red flag that warrants further inquiry.  Yet, Defendants chose PICA even though **PICA has billions in exposure to ModCo transactions with affiliates while companies like New York Life have *ZERO*.  Out of 702 life and annuity ("L&A") carriers, 651 L&A carriers had zero affiliated ModCo as of year-end 2023**. Gober Decl. ¶ 27.

109.    Over the past decade, PRU has been systematically gutting reserves from its regulated insurance company subsidiaries, primarily PICA, by engaging in suspect transactions with wholly owned captive reinsurance affiliates located in Arizona and affiliates offshore in known "secrecy jurisdictions" where financial records are not publicly available, and reserve requirements are lax. *See* Gober Decl. ¶¶ 12 (stating that "the trail gets lost"); *see also id.* ¶ 29.

110.    Since 2012, PICA has done at least tens of billions in PRT transactions in the U.S. *See* Gober Decl. ¶ 9 ("From 2012 when PICA first assumed responsibility for more than $32.5

---

[34] Kyeonghee Kim et al., *Regulatory Capital and Asset Risk Transfer*, JOURNAL OF RISK AND INSURANCE, at pp. 3, 12 (last rev. Nov. 3, 2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4221205.

[35] Kyeonghee Kim et al., *Regulatory Capital and Asset Risk Transfer*, at 3.

billion …"). PICA has also provided reinsurance to a number of Pension Schemes in the U.K. and taken on billions more in longevity exposure in other countries around the world. Therefore, if longevity outpaces PICA's assumptions, this also poses risk that PICA would not be able to fulfill its contractual obligations.[36]

## IV.    PICA is Far Riskier than PRU

111.    While PICA often refers to itself as simply "Prudential," Prudential ("PRU") and PICA have very different risk profiles. PRU—PICA's direct parent—is a publicly traded financial conglomerate with $1.496 trillion in assets under management as of April 30, 2024[37] and PRU owns hundreds of subsidiaries all over the world,[38] some of which are excellent credit risks. PRU derives substantial revenue from its regulated insurance company subsidiaries that offer individual life insurance and annuity products to consumers across the United States and around the world.

112.    However, PRU routinely publishes the following disclaimer in press releases and other publications:

> Pension and medical risk transfer products are insurance products issued by The Prudential Insurance Company of America (PICA), Newark, NJ, a wholly owned subsidiary of Prudential Financial Inc. (PFI). **PICA is solely responsible for its contractual and financial obligations**.[39]

---

[36] "Longevity risk refers to the chance that life expectancies and actual survival rates exceed expectations or pricing assumptions, resulting in greater-than-anticipated cash flow needs on the part of insurance companies or pension funds." Julia Kagan, *Longevity Risk: What it is, How it Works, Special Considerations*, INVESTOPEDIA (June 24, 2021), available at https://web.archive.org/web/20240716182622/https://www.investopedia.com/terms/l/longevityrisk.asp.

[37] PRUDENTIAL, *Prudential Financial, Inc. Announces First Quarter 2024 Results*, https://web.archive.org/web/20240810112749/https://news.prudential.com/latest-news/prudential-news/prudential-news-details/2024/Prudential-Financial-Inc.-Announces-First-Quarter-2024-Results/default.aspx ("Assets under management of $1.496 trillion versus $1.417 trillion for the year-ago quarter.").

[38] *See, e.g.*, https://www.sec.gov/Archives/edgar/data/1137774/000119312510043048/dex211.htm.

[39] PRUDENTIAL, *Institutions*, https://www.prudential.com/institutions (emphasis added) (last accessed July 2, 2025); *see also* PRUDENTIAL, *Prudential to fulfill $6 billion in protected*

113.    It is only at the very end of PRU's PRT press releases—including the press release covering the transaction at issue—where the above-referenced disclaimer appears.[40] PRU would be a more reasonable credit risk for the instant PRT transaction. However, PICA is not even close to suitable for the reasons detailed herein.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

---

*retirement obligations in second pension risk transfer with IBM* (Sep. 11, 2024), https://news.prudential.com/latest-news/feature-stories/feature-stories-details/2024/Prudential-to-fulfill-6-billion-in-protected-retirement-obligations-in-second-pension-risk-transfer-with-IBM/ ("Insurance products are issued by The Prudential Insurance Company of America (PICA), Newark, NJ. PICA is a Prudential Financial company. PICA is solely responsible for its financial condition and contractual obligations.").

[40] *Id.*



Insurance products are issued by The Prudential Insurance Company of America (PICA), Newark, New Jersey. PICA is a Prudential Financial company. PICA is solely responsible for its financial condition and contractual obligations.

115.    While PRU's misleading press releases are not the subject of this Amended Complaint, all Defendants know that retirees only have recourse to PICA and not PRU as set forth in the group annuity contract. As a result, PRU's financial condition is not even remotely relevant

at all to the obligations of Plan Fiduciaries to analyze the safety and security of the instant PICA transaction.

116.     **PRU has no liability whatsoever to IBM pensioners in the event of a PICA insolvency**. That is one of the main reasons why Plan Fiduciaries must thoroughly and completely analyze PICA's ability, as stand-alone entities to make good on their obligations to retirees. Defendants failed miserably in this regard.

117.     At the same time PICA has been rapidly piling up PRT risk, PICA has also been systematically circumventing state insurance reserve requirements by abusing wholly owned captive reinsurance companies, primarily in Arizona, and more recently affiliated reinsurers in Bermuda, to "reinsure" blocks of insurance policy claims or other insurance liabilities such as annuity funded pension payments to retirees and other PRT risks. *See* Gober Decl. ¶ 41 ("[I]t seems highly unusual …. There is no legitimate business purpose for swapping so much risk with wholly owned affiliates other than to circumvent reserve requirements, avoid SAP reporting requirements and artificially distort RBC ratios."). PICA and other PRU affiliates use Arizona and Bermuda as their "regulation light" jurisdictions of choice in order to exploit looser reserve and regulatory requirements and more favorable tax treatment.

118.     Each time a PRU subsidiary enters into a reinsurance transaction with another PRU owned affiliate or captive reinsurer that holds risky debt-like instruments as assets, it effectively lowers reserves that are supposed to be set aside to cover insured liabilities leaving policyholders and pensioners at substantial risk. This type of circular reinsurance with affiliates and/or captives was deemed "financial alchemy" or "shadow insurance"[41] by the New York State Department of

---

[41] *Shining a Light on Shadow Insurance*, NEW YORK STATE DEP'T OF FINANCIAL SERVICES (June 2013), https://02ec4c5.netsolhost.com/blog/wp-content/uploads/2013/06/NY-shadow-reinsurance-report-June-2013.pdf.

Financial Services ("DFS") in June of 2013 when DFS conducted an extensive investigation into these types of practices at New York-based insurance companies and their wholly owned captives and affiliates.

119.    While the DFS investigation did not focus on PRU (domiciled in New Jersey), the Superintendent of Financial Services of the State of New York, Benjamin M. Lawsky, was so shocked by the risks associated with the "financial alchemy" he uncovered that he wrote a detailed and ominous letter to the Honorable Sherrod Brown, then Ranking Member of the U.S. Senate Committee on Banking, Housing and Urban Affairs, urging Senator Brown to address:

> **a troubling regulatory loophole that threatens the financial stability of the insurance markets, puts everyday policyholders at substantial risk**, and provides billions of dollars in unearned tax deductions to large, multi-national corporations. That loophole is life insurance companies' use of "shadow insurance" vehicles to divert policyholder reserves to other purposes, such as executive compensation, dividends, and acquisitions.[42]

120.    PICA and its affiliates have engaged in the exact same kind of shadow insurance practices and other reserve-compromising transactions with affiliates. The mere fact that PICA's secret captives and affiliates hold so many circular debt and debt-like instruments as assets should have raised a red flag for any reasonably prudent fiduciary. The fact that PICA has encouraged and enabled more than $100 billion in affiliated party suspect reinsurance transactions with affiliates since 2012 alone should have immediately disqualified PICA from consideration as a sound choice for IBM pensioners, especially since PICA is solely responsible for its financial

---

[42] *See* Letter dated April 27, 2015, from Benjamin M. Lawsky, Superintendent of Financial Services, State of New York to The Honorable Sherrod Brown, Ranking Member, U.S. Senate Committee on Banking, Housing and Urban Affairs, entered into the record during the Hearing Before the Committee on Banking, Housing, and Urban Affairs on April 28, 2015, at p. 46, https://www.govinfo.gov/content/pkg/CHRG-114shrg97357/pdf/CHRG-114shrg97357.pdf (last retrieved on August 3, 2025) (emphasis added).

condition and contractual obligations.

121.    Either State Street and/or IBM failed to examine the financial statements of the affiliated reinsurers (which would be a blatant breach of their fiduciary duties), or, they failed to understand how PICA's exposure to their wholly owned affiliates created risk for the plan participants—whose interests should have been front and center. Both failures put IBM retirees at substantial risk that could easily have been avoided by following ERISA's mandates.

122.    While the assets held by PICA's wholly owned captive reinsurers and affiliates may not be readily ascertainable due to the fact that the captives and affiliates are located in secrecy jurisdictions and do not file publicly available financial statements,[43] the amount of credit that PICA has taken for reinsurance with its wholly owned affiliates is easy to obtain by simply reviewing readily available statutory financial statements as noted above.

123.    When U.S. regulated insurance companies take credit for reinsurance with captives and affiliates that do not report under SAP or make financial statements publicly available it puts retirees at substantial risk. Affiliated party reinsurance transactions are not arm's length, as pricing is set within the same group of companies under common control. It amounts to nothing more than a circular movement of assets and liabilities that appears to provide security to policyholders while doing the exact opposite. Real assets vanish and they are replaced with speculative "IOU's."[44] *See* Gober Decl. ¶¶ 26, 31, 43.

---

[43] "Captives' financial statements are typically not public. In 2013, regulators for the first time required life insurers to identify their *total* captive reinsurance activity separately in annual statements." OFFICE OF FINANCIAL RESEARCH, *Mind the Gaps: What do new Disclosures Tell us About Life Insurers' Use of Off-Balance-Sheet Captives?* (Mar. 17, 2016), at 1, available at https://www.financialresearch.gov/briefs/files/OFRbr_2016-02_Captive-Insurers.pdf; *see also id.* ("Because life insurers are a material part of the financial system, these gaps may mask financial stability vulnerabilities.").

[44] *See, e.g.*, Michael Batty, FEDS Notes, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM (Oct. 12, 2018) https://www.federalreserve.gov/econres/notes/feds-notes/accounting-for-reinsurance-transactions-in-the-financial-accounts-of-the-united-states-20181012.html ("[A]

124.    PICA's excessive interdependence within the PRU holding company system should have been a bright red flag for IBM and State Street. PICA both cedes liabilities to affiliates and reinsures affiliates, including its own wholly owned Arizona captives as noted below. Another PICA affiliate, PGIM, provides investment management services to PRU,[45] and PICA affiliates guarantee the obligations of other PICA affiliates in a glaring and circular manner.

125.    Despite Lawsky's ominous warning to Congress, PRU, through PICA, dramatically increased its use of shadow insurance after 2015 and PICA's cumulative reserve credit taken for reinsurance with wholly owned affiliates and captive insurance companies domiciled in Arizona far exceeds PICA's surplus. Just the two primary PRU carriers combined went from $19.1 billion in shadow insurance transactions in 2012 to **$133 billion** at year end 2023, as shown on the chart below.

//

//

//

//

//

//

//

//

//

reinsurer can cede the policies it assumes to another reinsurer ('retrocession'), **creating chain of interdependence**.") (emphasis added).

[45] "PGIM is the investment management business of Prudential Financial, Inc. (PFI)." https://www.pgim.com/us/en/institutional/about-us/overview.





Gober Decl. ¶ 34.

126.    PICA increased its exposure to reinsurance with non-arm's length affiliates and captives in Arizona and Bermuda from $7,794,844,220 in 2012, to **$72,884,344,104** as of year-end 2023 as per the chart below.

//

//

//

//

//

//

//

//





Gober Decl. ¶ 32.

127.    PICA was a far more reasonable choice of annuity provider in 2012 as it had only

taken $7.8 billion in credit for reinsurance and ModCo with affiliates as reported on December 31,

2012. Contrast PICA at year end 2012 with PICA at year end 2023 and as depicted in the above

chart, PICA's exposure to affiliates jumps tenfold to **$72.8 billion** as at December 31, 2023.

128.    Ironically, PICA in 2012 would have been a safer and more prudent choice than the

PICA of today that is wholly dependent on non-arm's length, contrived transactions with wholly

owned captives and affiliates that only serve to conceal PICA's true financial condition. New York

Life would have been a far safer choice than PICA. **In addition to New York Life, Pacific Life**

**and Nationwide would have also been much more appropriate choices for the annuitization**

**transactions than PICA**. *See* Gober Decl. ¶ 69. All three of those companies participate in the

pension risk transfer business. However, these companies would have charged more money and so they were not selected for the annuitization transactions at issue.

129.    The Northwestern Mutual Life Insurance Company, USAA Life Insurance Company, The Guardian Life Insurance Company of America, and TIAA-CREF Life Insurance Company also would have been safer than PICA for the annuitization transactions.

130.    In addition to PICA's own dependence on affiliated captives and affiliated reinsurers, another affiliate, Pruco Life Insurance Company ("Pruco Life"), a wholly owned subsidiary of PICA, increased its affiliated party exposure from $11,328,051,539 in 2012, to over $60 billion dollars (**$60,194,654,216**) as of year-end 2023. *See* the chart below.



Gober Decl. ¶ 33.

131.    Both PICA and Pruco Life are wholly owned PRU subsidiaries. Combined, PICA and Pruco Life reported reinsurance "IOUs" or recoverables of $133 billion from affiliates/captive reinsurers and those same affiliates/captive reinsurers reported **$133 billion** in reinsurances

payables as of year-end 2023. In other words, $133 billion of PRU's reinsurance is, if not worthless, circular in nature and internal within the PRU group rather than with arm's length, independent, well capitalized reinsurance companies. *See* the chart below.

ANNUAL STATEMENT FOR THE YEAR 2023 OF THE PRUDENTIAL INSURANCE COMPANY OF AMERICA

## SCHEDULE Y
## PART 2 - SUMMARY OF INSURER'S TRANSACTIONS WITH ANY AFFILIATES

| Names of Insurers, Parent, Subsidiaries, Affils. | | Reins Recov./(Payable) and/or Reserve Credit Taken (Liability) | Total Captive & Offshore Payables to Affiliates |
|---|---|---|---|
| Prudential Legacy Insurance Company of New Jersey | $ | (47,330,009,584) | |
| **Captive**: Prudential Arizona Reinsurance Universal Co | $ | (18,702,977,557) | |
| **Captive**: Prudential Universal Reinsurance Company | $ | (11,289,411,284) | |
| **Captive**: Gibraltar Universal Life Reinsurance Co | $ | (4,885,738,352) | |
| **Offshore**: Lotus Reinsurance Company Ltd. | $ | (4,429,331,636) | |
| **Captive**: Prudential Term Reinsurance Company | $ | (3,838,169,748) | |
| **Captive**: Prudential Arizona Reinsurance Captive Co | $ | (3,543,086,059) | |
| **Captive**: Prudential Arizona Reinsurance Term Co | $ | (3,399,032,599) | |
| **Captive**: Dryden Arizona Reinsurance Term Co | $ | (1,543,328,775) | $ (51,638,750,002) |
| **Captive**: Prudential Universal Reinsurance Entity Co | $ | (7,673,992) | |
| Prudential Seguros Mexico, S.A. de C.V. | $ | (2,047,438) | |
| Pruco Life Insurance Company of New Jersey | $ | 5,121,823,968 | |
| The Gibraltar Life Insurance Co., Ltd. | $ | 7,817,159,971 | |
| The Prudential Life Insurance Company, Ltd. | $ | 25,241,215,614 | |
| The Prudential Insurance Company of America | $ | 25,263,214,461 | |
| Pruco Life Insurance Company | $ | 35,527,393,010 | |
| **TOTAL:** | | **$0.00** | |

Gober Decl. ¶ 37.

132.    In the snapshot above, a clear pattern emerges. The numbers in **red** represent amounts owed by the captives and affiliates; the numbers in **black** are recoverables, or, amounts owed by PICA's wholly owned captive reinsurance companies in Arizona and one offshore affiliate, Lotus Reinsurance Company Ltd. located in Bermuda, to PICA and other US based PICA affiliates. Nearly all of the reinsurers with very large amounts due to PRU regulated insurers are the Arizona Captives that do not file public financial statements. Those Arizona Captives owned

47

by PICA owe more than **$47 billion** to PRU affiliates. Such enormous amounts due from secretive "captives" cannot be detected on the balance sheets of the insurers because, rather than report the recoverables as assets, the $47 billion recoverables are netted out of their claims reserve liabilities, booking them as "contra-liabilities." Those amounts are deducted from the claims reserve liabilities prior to reporting them on the balance sheet. While the financial statements of the "captives" owing more than $47 billion to the regulated PRU insurers are not publicly available, any reasonable independent fiduciary would to inquire into whether or not the Arizona Captives had sufficient assets to make good on $47 billion in IOUs to PICA and affiliates. Without definitive proof that the Arizona Captives have the financial ability to make good on more than $47 billion in IOU's, the ability of PICA to pay its debts in the ordinary course of business and its obligations to retirees is entirely uncertain. Yet, no information whatsoever about how IBM and State Street evaluated PICA's financial capabilities has been made available to retirees.

133.    In addition, while all of the Arizona Captives are wholly owned by PICA, PICA values its investment in most of its captives at **zero**. This is extremely troubling. How can Arizona affiliates with hundreds of billions in financial obligations to PICA and Pruco Life be fairly valued at **zero**? If they are, how can PICA be a prudent choice as an annuity provider. *See* below.

//

//

//

//

//

//

//

48

ANNUAL STATEMENT FOR THE YEAR 2023 OF THE PRUDENTIAL INSURANCE COMPANY OF AMERICA

## SCHEDULE D - PART 2 - SECTION 2

Showing All COMMON STOCKS Owned December 31 of Current Year

| 1 CUSIP Identi-fication | 2 Description | Codes | | 5 Number of Shares | 6 Book/ Adjusted Carrying Value | Fair Value | | 9 Actual Cost |
|---|---|---|---|---|---|---|---|---|
| | | 3 Code | 4 For-eign | | | 7 Rate Per Share Used to Obtain Fair Value | 8 Fair Value | |
| 74408#-10-9 ... | PRUCO Life Insurance Company | ..... | ..... | 250,000,000 | 5,160,579,278 | 20,642,000 | 5,160,579,278 | 6,033,948,757 |
| | Prudential Legacy Insurance Company of New Jersey | | | | | | | |
| 000000-00-0 ... | Prudential Realty Securities, Inc. | ..... | ..... | 5,000,000,000 | 227,127,252 | 45,000 | 227,127,252 | 172,220,809 |
| 744355-2#-4 ... | | ..... | ..... | 92,000 | 569,307,672 | 6,188,127,000 | 569,307,672 | 570,506,541 |
| | Prudential Retirement Insurance and Annuity Company | | | | | | | |
| 000000-00-0 ... | Prudential Arizona Reinsurance Universal ... | ..... | ..... | 25,000,000 | 0 | 0.000 | 0 | 0 |
| 000000-00-0 ... | Prudential Arizona Reinsurance Term Company ... | ..... | ..... | 1,000,000 | 0 | 0.000 | 0 | 0 |
| 000000-00-0 ... | Prudential Arizona Reinsurance Captive Company ... | ..... | ..... | 1,000,000 | 0 | 0.000 | 0 | 0 |
| 000000-00-0 ... | Prudential Universal Reinsurance Company | ..... | ..... | 1,000,000 | 0 | 0.000 | 0 | 0 |
| 000000-00-0 ... | Gibraltar Universal Life Reinsurance Company | ..... | ..... | 1,000,000 | 0 | 0.000 | 0 | 0 |

Captives                                    PICA investments in captives valued at $0.00

134.    Simply stated, if the value of the Arizona Captives identified above is **zero**, they cannot conceivably have the financial wherewithal to make good on their IOU's, which include tens of billions of dollars in reinsurance payables to PICA. *See* Gober Decl. ¶ 21 ("PICA valued … [the] Arizona Captives, interestingly, at zero").

135.    In addition to the tens of billions of liabilities ceded to the Arizona Captives and newly created Bermuda reinsurers, PICA also entered into a significant number of highly suspect ModCo transactions. *See* Gober Decl. ¶ 39.

136.    PICA affiliates have more than $33 billion in seemingly circular ModCo transactions. It is circular and highly suspect for PICA to assume billions in ModCo from PRUCO Life Insurance Company of New Jersey, its wholly owned subsidiary while also ceding billions in ModCo to Pruco Life Insurance Company (AZ), another PICA affiliate located in Arizona. *See* Gober Decl. ¶ 40.

//

//





Gober Decl. ¶ 40.

137.    Similar to the concerns expressed above about the shadow insurance transactions using Arizona Captives, it seems highly unlikely that the affiliate ModCo transactions are legitimate, and they are most certainly not arm's length. At the very least, it seems highly unusual for Prudential to use ModCo for more than $33 billion in related party transactions as these transactions involve little more than a swapping of IOUs for insurance risks that were underwritten and assumed at the regulated insurance company levels. There is no legitimate reason for swapping so much risk with wholly owned affiliates other than to avoid reporting requirements and artificially enhance risk-based capital ratios. Using and abusing circular ModCo to game RBC levels and thereby reduce minimum required surplus is directly contrary to the intended purpose of establishing minimum capital standards to reduce insolvency risk.

138.    The Arizona Captives that maintain secret financial records are on the hook for a substantial portion of the **$133 billion** that they will never be able to pay. More importantly, a significant amount of the $133 billion that PRU insurers claim to be owed from affiliates and the Arizona Captives has already been up-streamed to PRU for non-policyholder purposes, including management fees, investment fees, affiliated reinsurance premiums, and dividends leaving the PRU regulated insurers dramatically under-reserved. In 2023 alone, PRU spent more than $1 billion on stock buy-back transactions. Gober Decl. ¶ 42.

139.    PICA's captive reinsurance companies in Arizona are allowed to replace real assets with "**hollow assets**" for reserving purposes including conditional letters of credit, circular parental guarantees, complex surplus notes, including credit linked surplus notes and other collateral of speculative value such as assets identified only as "LOC-like" on statutory financial statements. These type of "hollow assets" are not considered proper assets for an insurance company regulated in New Jersey or in any jurisdiction that adheres to the NAIC Accounting Practices & Procedures

51

Manual, NAIC Model Holding Company Act (NAIC Model Insurance Laws, Regulations and Guidelines, NAIC Model Act #440) and the NAIC Annual Statement Instructions. *See* Gober Decl. ¶ 43.

140.    Based on a forensic review of public filings, as of year-end 2023, expert Certified Fraud Examiner Tom Gober was able to identify a staggering number of circular related-party transactions as set forth in the chart below:



Gober Decl. ¶ 44.

141.    **Through a detailed review of the entire PRU Holding Company System it becomes clear that there is a dangerous level of interdependence among the myriad affiliates**. They reinsure each other, invest in each other, pay dividends to each other, pay management fees to each other and guarantee each other. The interdependence among affiliated entities is glaring, the movement of assets and liabilities circular and the risks far greater to pensioners than what prudence and loyalty permits of Plan fiduciaries such as IBM and State Street. All of the above information about PICA and its affiliates can be found in publicly available Statutory Financial

Statements available from PICA itself and also available by request made to the New Jersey Insurance Department and the NAIC. **Had IBM and State Street done even a fraction of the analysis that Plaintiffs did before filing the instant action, they could not possibly have reasonably concluded that the PICA transactions were consistent with their fiduciary duty under ERISA**—the highest fiduciary duty in the land. In fact, given the scope and magnitude of PICA's suspect transactions with wholly owned captives and affiliates, both on-shore and off-shore, to conclude that PICA was a secure steward of Plaintiffs' and Class Members' pensions defies all logic and reeks of self-dealing.

142.    Even PICA's reported use of "unaffiliated reinsurers" does not appear to be accurate. By way of example, in 2023, PICA entered into a new reinsurance transaction of approximately $10 billion ($9.97 billion) with a newly formed offshore reinsurer, Prismic Life Reinsurance, Ltd. of Bermuda ("Prismic"). However, in SCHEDULE S – PART 3, (Reinsurance Ceded) PICA reported Prismic as non-affiliated even though PRU (PICA's ultimate parent) is listed as one of two lead investors in Prismic. Another PRU affiliate, PGIM (PRU's principal asset manager) provides asset management services to Prismic and PRU executives sit on the Prismic board of directors in order to "oversee its long-term strategy…."[46] It is simply not reasonable to describe PICA's reinsurance relationship with Prismic as unaffiliated. Yet that is exactly how PICA describes it in public filings. *See* Gober Decl. ¶¶ 46-47.

143.    Related party reinsurance requires mandatory additional regulatory scrutiny and the NAIC Model Holding Company Act, which has been adopted by all fifty states specifically requires that all transactions within an insurance holding company system shall be on terms that

---

[46] https://web.archive.org/web/20250522224217/https://news.prudential.com/latest-news/prudential-news/prudential-news-details/2023/Prudential-Financial-Inc--and-Warburg-Pincus-announce-launch-of-Prismic-Life-Re-09-07-2023/default.aspx.

are "fair and reasonable[.]" N.Y. Ins. Law § 1505(a)(1); N.J. Stat. Ann. § 17:27A-4(a)(1)(a); Mass. Gen. Laws Ann. ch. 175, § 206C(m)(1). In addition, the Model Holding Company Act requires that books and records be so maintained as to clearly and accurately disclose the true nature and details of the transactions in question. N.Y. Ins. Law § 1505(b); N.J. Stat. Ann. § 17:27A-4(e); Mass. Gen. Laws Ann. ch. 175, § 206C(m)(4). Yet PICA reports under SAP and the Arizona captives and the Bermuda affiliates report under a different accounting regime known as generally accepted accounting principle ("GAAP").[47]

144.    Defendants' failure to reconcile massive, related party transactions that go directly to PICA's ability to make pension payments to Plaintiffs and all 132,000 Class Members for decades is at the heart of this case.

145.    Also of note is the fact that Prismic reports under Bermuda GAAP and not SAP like PICA. This reporting discrepancy alone adds to the overall lack of transparency within the complex PRU holding company system. All of this suspect reporting on publicly filed statutory financial statements should have raised red flags for fiduciaries tasked with choosing safe and secure annuity contracts to replace ERISA-protected defined benefit plan obligations. How State Street and/or IBM could have ignored all of this publicly reported information and still chosen PICA as a suitable annuity provider for IBM plan participants defies logic.

146.    PICA also ceded over $2.29 billion to an affiliated Bermuda based reinsurer called Lotus Reinsurance Company Ltd. ("Lotus").  *See* chart below.

//

//

---

[47] *See supra* note 4.

ANNUAL STATEMENT FOR THE YEAR 2023 OF THE PRUDENTIAL INSURANCE COMPANY OF AMERICA

**SCHEDULE S - PART 3 - SECTION 1**

Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities Without Life or Disability Contingencies, and Related Benefits Listed by Reinsuring Company as of December 31, Current Year

| 1 NAIC Company Code | 2 ID Number | 3 Effective Date | 4 Name of Company | 5 Domiciliary Juris-diction | 6 Type of Reinsurance Ceded | 7 Type of Business Ceded | 8 Amount in Force at End of Year | 9 Reserve Credit Taken Current Year | 10 Prior Year |
|---|---|---|---|---|---|---|---|---|---|
| 1499999. | Total General Account - Unauthorized U.S. Affiliates | | | | | | 12,051,745 | 7,498,417 | 0 |
| ..00000 | AA-2731006 | 11/01/2006 | Prudential Seguros, S.A. - Mexico | MEX | OTH/1 | 0L | 970,291,947 | 0 | 0 |
| ..00000 | AA-2731006 | 11/01/2006 | Prudential Seguros, S.A. - Mexico | MEX | YRT/1 | 0L | 8,866,417,470 | 0 | 0 |
| ..00000 | AA-3191481 | 01/01/2022 | Lotus Reinsurance Company | BMU | COMB/1 | 0L | 33,622,091,599 | 2,210,500,193 | 2,241,974,090 |
| ..00000 | AA-3191481 | 01/01/2022 | Lotus Reinsurance Company | BMU | COMB/1 | XXXL0 | 1,014,396,546 | 82,291,592 | 72,226,637 |

147.    According to Lotus, effective February 1, 2022, Lotus became a wholly owned subsidiary of Prudential International Insurance Holdings, Ltd. ("PIIH"),[48] which in turn is a direct wholly owned subsidiary of PRU. Lotus has extensive related party transactions with PRU, PICA, Prudential International Insurance Service Company, LLC and other PRU affiliates and PGIM provides discretionary investment advisory services to Lotus. *See* Gober Decl. ¶ 49. Prior to February 1, 2022, Lotus was wholly owned by PICA.[49] Lotus has extensive related party transactions with PRU, PICA, Prudential International Insurance Service Company, LLC and other PRU affiliates and PGIM provides discretionary investment advisory services to Lotus.[50]

148.    As of year-end 2023 PICA and PRUCO had ceded $4.1 billion in liabilities to Lotus and consummated ModCo transactions totaling $23.6 billion. Yet, Lotus only reported total assets of $1.3 billion and liabilities of only $23.7 million. Gober Decl. ¶ 50. Any reasonable fiduciary should have questioned the integrity of Lotus's financial reporting.

---

[48] LOTUS REINSURANCE CO. LTD., FINANCIAL STATEMENTS AND REPORT OF INDEPENDENT AUDITORS, available at https://cdn.bma.bm/documents/2023-06-30-15-52-10-Lotus-Reinsurance-Company-Ltd.---2022-Financial-Statement.pdf.

[49] STATE OF NEW JERSEY, *Coordination Examination Report Relating To The Condition Of The Prudential Insurance Company Of America Newark, New Jersey* (as of Dec. 31, 2021), at 25, https://www.nj.gov/dobi/division_insurance/solvency/finexamrpt68241prudentialins2021.pdf ("Effective February 1, 2022, PFI repositioned Lotus Re from being a wholly owned subsidiary of the Company to being a wholly owned subsidiary of Prudential International Insurance Holdings.").

[50] *See supra* note 48 ("The Company entered into an investment advisory agreement with PGIM, Inc. ('PGIM'), a PFI affiliated company, whereby PGIM provides discretionary investment advisory services to the Company, …").

149.    The structure that PRU uses with its affiliated Bermuda Reinsurance Company Lotus has been described by investigative journalist and Annuity expert Kerry Pechter as the "Bermuda Triangle" phenomenon.

150.    As Pechter wrote in the RETIREMENT INCOME JOURNAL (the "RIJ"):

> What *RIJ* calls "the Bermuda Triangle" is a synergistic, much-varied business model involving a kind of triple accounting play between:
>
> - A US domiciled life insurer that issues fixed-rate or fixed indexed annuities
> - An asset manager with global reach and expertise in alternative assets and origination of high-yield loans
> - A reinsurer in a jurisdiction (e.g., Bermuda, Cayman Islands, Vermont) that permits the valuation of annuity liabilities according to Generally Accepted Accounting Principles (GAAP) along with or instead of the more conservative Statutory Accounting Principles required of all US life insurers
>
> In the Bermuda Triangle's purest form, all three players belong to the same holding company. They may also have some overlapping ownership, or may be strategic partners. Life insurers who employ all or part of the Bermuda Triangle strategy include leading FA and/or FIA sellers like Athene Annuity & Life, Global Atlantic, AIG, MassMutual, and others. Together, Bermuda Triangle companies accounted for about half of the $116.8 billion in 2021 fixed-rate/fixed indexed annuity sales reported by LIMRA's Secure Retirement Institute.[51]

151.    A detailed review of PICA's public filings and its overwhelming dependence upon affiliates is exactly the type of analysis contemplated by ERISA in order for an independent fiduciary to choose the "**safest available annuity**" or even a reasonably secure annuity. 29 CFR § 2509.95-1 (emphasis added). IBM and State Street failed miserably in this regard.

152.    Had Defendants considered the quality and diversification of PICA's investment portfolio, they would have known that PICA reported close to $18 billion in investments it lists as

---

[51] Pechter, K., *Why RIJ Obsesses over the 'Bermuda Triangle'*, RETIREMENT INCOME JOURNAL (May 5, 2022), https://retirementincomejournal.com/article/why-rij-obsesses-over-the-bermuda-triangle/ (last accessed July 22, 2025).

"Affiliated Investments" as of year-end 2023 which is **more than 111% of its surplus**.

153.    Defendants would have known PICA has more than $10 billion in investments it simply describes as "Other" Invested Assets.

154.    Defendants would have known that PICA also reported as of year-end 2023 "Other Loan-Backed" investments in the amount of $10,838,636,616 and its exposure to Commercial Mortgages was $16,349,437,360.

155.    PICA takes on relatively riskier assets than its peers. *See, e.g.*, Gober Decl. ¶ 69 ("PICA and its insurer affiliates also hold excessive concentrations of higher-risk, less liquid investments …").

156.    Executive Life failed, in part, due to similar, risky assets and dwindling surplus.[52]

157.    Had Defendants considered the level of PICA's capital and surplus they would have known that PICA's Surplus as a percentage of its liabilities was reported at 5.7% as of year-end 2023 and Pruco Life's was at 3.2%, well below industry averages which approximate 7.5%. Gober Decl. ¶ 52. But this low surplus is, in fact, substantially inflated because it does not account for the suspect reinsurance and ModCo transactions described herein.

158.    By way of comparison, New York Life's ratio of Surplus to Liabilities was approximately 12.2% as of year-end 2023,[53] Teachers Ins. & Ann was at 13.8% as of year-end

---

[52] *See* UNITED STATES GENERAL ACCOUNTING OFFICE, *Insurer Failures: Regulators Failed to Respond in Timely and Forceful Manner in Four Large Life Insurer Failures* (for release on Sept. 9, 1992), at 3-4, available at https://www.gao.gov/assets/t-ggd-92-43.pdf ("To cover the high rates promised to policyholders and maintain profitability, the four insurers invested in risky, high-yield assets. These insurers became heavily concentrated in the junk bond market and, to a lesser extent, invested in real estate-related assets.").

[53] *See* 2023 NY LIFE REPORT, at 3 (surplus of $25,294,076,431 divided by total liabilities of $206,607,540,338 = 0.122), available at https://www.newyorklife.com/assets/docs/pdfs/financial-info/2023/NYLIC-4th-Qtr-2023-Statement.pdf.

2023[54] and Guardian Life was at 12.7%.[55] Clearly, all of these entities are objectively safer annuity providers than PICA even if Plan fiduciaries claim to have relied on PICA's stated surplus.

159.    Had Defendants considered PICA's lines of business and PICA's exposure to liability, they would have known that PICA's surplus is dramatically overstated taking into consideration all of the exposure PICA has to Pruco Life and its own exposure to wholly owned captive reinsurance companies in Arizona and affiliates in Bermuda. In 2023 alone, PICA took credit for reinsurance in the amount of **$12.5 billion** for liabilities ceded to Pruco Life, its wholly owned subsidiary that also cedes to PICA's wholly owned Arizona Captives:

ANNUAL STATEMENT FOR THE YEAR 2023 OF THE PRUDENTIAL INSURANCE COMPANY OF AMERICA
### SCHEDULE S - PART 3 - SECTION 1
Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities Without Life or Disability Contingencies, and Related Benefits Listed by Reinsuring Company as of December 31, Current Year

| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|
| | Domi-ciliary Juris-diction | Type of Reinsurance Ceded | Type of Business Ceded | | Reserve Credit Taken | |
| Name of Company | | | | Amount in Force at End of Year | Current Year | Prior Year |
| Pruco Life Insurance Company | AZ | CO/I | AXXX | 31,287,284,000 | 11,169,632,396 | 11,562,465,269 |
| Pruco Life Insurance Company | AZ | CO/I | AXXX | 4,321,016,000 | 1,468,249,536 | 1,531,086,438 |

160.    There does not appear to be any legitimate business reason for PICA to cede liabilities to wholly owned subsidiaries, and, when those subsidiaries also cede liabilities to *other* wholly-owned PICA subsidiaries, the circular nature of this shuffling around of obligations becomes clear. Unfortunately, circular reinsurance transactions with affiliates undermines policyholder security and puts pensioners at substantial risk.

161.    Had Defendants considered the structure of PICA and other indications of PICA's

---

[54] *See* 2023 TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, at 3, https://www.tiaa.org/public/pdf/tiaa-annual-statement-2023.pdf (surplus of $42,108,572,695 divided by total liabilities of $304,392,436,386 = 0.138).

[55] *See* 2023 GUARDIAN LIFE INSURANCE CO. OF AMERICA, ANNUAL STATEMENT, at 3, https://assets.ctfassets.net/gau1nv66ynug/4Rzh4QH8LNdGeoffg8SAKY/98e3eafe36b1956087c7 b4fcaa520a4f/4Q23_NAIC_-64246_-_2023_Guardian_Statutory_Statement.pdf (surplus of $9,072,358,547 divided by total liabilities of $71,193,824,441 = 0.127).

exposure to liability they would have known that PICA is dramatically under reserved.

162.    Tellingly, the UK Prudential Regulation Authority (the "PRA") "issued new requirements for its use on July 26 this year over concerns about 'a rapid build-up of risks' at UK life insurers if growth in usage was left unchecked. Insurers had been using more funded reinsurance to help meet a surge in demand for pension risk transfer (PRT) deals."[56]

163.    According to a Bank of England PRA Supervisory statement:

> The PRA considers that there are increased risks in connection with funded reinsurance, including from a **systematic use of funded reinsurance** as an integral part of a firm's business model or from the use of more complex arrangements where it may be more difficult for firms to assess the full extent of risks involved.[57]

164.    An "executive director for insurance supervision at the [Bank of England]'s Prudential Regulation Authority, told insurers it was concerned that the growth in funded reinsurance transactions 'could, if not properly controlled, lead to a **rapid build-up of risks in the sector**[.]'"[58]

## V.    The Consequences of Suspect Transactions with Affiliates are Real and Imminent

165.    The concerns about the consequences of all of PICA's suspect transactions with affiliates are real and imminent. In 2024 alone, several life and annuity issuers were placed into rehabilitation or subjected to regulatory action as a direct and proximate result of imploded affiliated party reinsurance. These entities include the following:

- Columbian Mutual Life Insurance Company ("Columbian Mutual");

---

[56] https://www.spglobal.com/market-intelligence/en/news-insights/articles/2024/12/uk-pension-risk-transfer-market-to-withstand-regulator-s-reinsurance-clampdown-85971157 (emphasis added).

[57] https://www.bankofengland.co.uk/-/media/boe/files/prudential-regulation/supervisory-statement/2024/ss524-november-2024-update.pdf (emphasis added).

[58] Ian Smith, *Bank of England warns it will restrict reinsurance deals if controls are not improved*, FINANCIAL TIMES (July 26, 2024), https://www.ft.com/content/5f6c6469-e134-4baa-90fe-e46a5bb373b6 (emphasis added).

- Columbian Life Insurance Company ("Columbian Life");

- PHL Variable Insurance Company; and

- 777 Reinsurance Ltd. ("777 Re").

166.    All of the recent failures had one thing in common: excessive reliance upon non-arm's length reinsurance with affiliates and the exact same type of financial alchemy that Plaintiffs complain of in this case.

167.    Columbian Mutual was placed into Rehabilitation by the New York State Department of Financial Services on August 13, 2024 following a failed merger and demutualization sponsored by Constellation Insurance Holdings, Inc. When the NYS Department of Financial Services conducted asset adequacy testing, it required Columbian Mutual to contribute more than $100,000,000 to its asset adequacy reserves. This took Columbian Mutual's surplus from $25 million to negative $88 million overnight. This led to an immediate ratings downgrade and regulatory action by the State of New York Department of Financial Services and parallel regulatory action by the Insurance Commissioner of the State of Illinois where Columbian Life Insurance Company, an affiliate of Columbian Mutual, is domiciled. Both Columbian Mutual and Columbian Life went from positive to negative surplus in short order, and the adjustments to surplus had not taken into account the fact that Columbian Life ceded liabilities in the amount of $587 million to Columbian Mutual—liabilities that neither entity has the financial wherewithal to meet. Both Columbian Mutual and Columbian Life recently announced that they were entering into a purchase agreement with JAB Insurance as a central component of a proposed Plan of Rehabilitation, but no details have been provided about the $572 million in liabilities that were

ceded from Columbian Life to Columbian Mutual in circular affiliated party reinsurance transactions.

168.    PHL Variable Insurance Companies and its subsidiaries, Concord Re, Inc. and Palisado Re, Inc. ("PHL") were ordered into Rehabilitation on May 20, 2024. In connection with the PHL Rehabilitation, the Connecticut Insurance Commissioner determined that "further transaction of business would be financially hazardous to its policyholders, creditors and the public."[59] Many of the reasons for PHL's rehabilitation can be traced to non-arm's length reinsurance transactions with affiliates.

169.    PHL is heavily dependent upon reinsurance with affiliates and captives located in Connecticut and the Cayman Islands and reinsurance with another affiliate Nassau Life & Annuity Co. ("Nassau") and circular reinsurance and suspect ModCo transactions with other Nassau and PHL affiliates.

170.    As a result of the rehabilitation, the PHL Rehabilitator issued a Temporary Moratorium Order effective May 20, 2024 limiting policy withdrawals, surrenders and death benefit payouts to certain guaranty association cap limits. Policyholders were immediately impacted by the Moratorium Order that was made permanent on June 25, 2024 and continues to this day.

171.    777 Re assumed billions in opaque Modco liabilities from the Sentinel Security Life Insurance Company, Haymarket Insurance Company and Jazz Reinsurance Company (collectively, the "ACAP Companies"). 777 Re surrendered its reinsurance license to the Bermuda

---

[59] https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo= 27532057.

Monetary Authority on October 8, 2024, and the ACAP Companies recaptured all of the ceded ModCo liabilities.

172.     The future of the aforementioned entities is uncertain and all of the recent regulatory events highlight just how suspect and opaque affiliated party reinsurance and ModCo transactions can be and just how risky this type of financial alchemy is for unsuspecting policyholders including pensioners like putative Class Members herein.

173.     Based on the information set forth in this First Amended Complaint, a reasonable independent fiduciary acting in the best interests of Plan Participants in accordance with ERISA's requirements could not possibly have chosen the PICA structure for Plaintiffs and other putative Class Members.

## VI.    IBM's and State Street's Choice of PICA was Motivated by Financial Self-Interest and was Therefore Disloyal and the Transactions Prohibited by ERISA

174.     In choosing PICA for the annuity transaction at issue, IBM and State Street systematically ignored red flags like affiliated party reinsurance, high concentrations of risky assets and circular ModCo transactions as set forth *supra*.

175.     IBM's reasons for doing so were to save millions of dollars and for immediate tax benefits. State Street's reasons for doing so are also suspect, given State Street's own, substantial financial interests in both PICA (through PRU) and IBM.

176.     In a market with no shortage of stable and established annuity providers, no prudent and loyal fiduciary would have offloaded billions of participants' retirement savings to PICA under the circumstances then prevailing. IBM sacrificed the retirement security of retirees and beneficiaries for corporate profits.

177.     With the dramatic increase in PRT transactions during 2022 as more firms entered the space, Milliman (which is "among the world's largest independent actuarial and consulting

firms"[60]) reported that the spread between average and competitive bids has widened, emphasizing the importance of fiduciaries ensuring that low bidders are not taking undue risks.[61]

178.    Other sources confirm the trend of employers in PRT transactions selecting the lowest-cost annuity provider. In 2022, for partial buyouts, Aon[62] reported that "**[p]lan fiduciaries selected the lowest bidder 78% of the time**."[63]

179.    **Given this statistic, it is no coincidence that "Prudential has completed seven of the 10 largest U.S. pension risk transfers on record**."[64] Prudential completed seven of the ten largest U.S. PRTs likely because Prudential offered the cheapest cost, and, in over 7 of 10 times, employers have been documented to have chosen the lowest cost annuity.

180.    The primary reason IBM entered into the PICA transactions was to decrease its future liabilities, avoid paying fixed premiums to the PBGC, and the cost of uncertainty and volatility associated with its Plan.

181.    By entering into the transaction with PICA, IBM saved millions of dollars by avoiding paying premiums to the PBGC. For single-employer plans like IBM's, the premium due for each year is at least a "flat-rate premium based on the number of participants."[65] Assuming all 132,000 retirees were still in the plan, IBM would have owed nearly $14 million in flat-rate

---

[60] https://www.linkedin.com/company/milliman.

[61] *See* Fiona Ng et. al., *Pension Risk Transfer: Staying Current in a Rapidly Evolving Market*, MILLIMAN (June 23, 2023), https://www.milliman.com/en/insight/pension-risk-transfer-staying-current-evolving-market.

[62] Aon is "a global professional services firm." https://www.forbes.com/companies/aon/.

[63] AON, U.*S. Pension Risk Transfer: Market Insights*, (Mar. 2023), at 12, https://www.aon.com/insights/reports/2023/us-pension-risk-transfer-market-insights (emphasis added).

[64] https://www.prudential.com/institutions/pension-risk-transfer/2024-in-review.

[65] https://www.pbgc.gov/about/factsheets/page/premiums.

premiums in just 2025 alone.[66]

182. IBM also entered the transaction to obtain significant tax benefits. According to IBM's 2024 Annual report, IBM's "2024 and 2022 tax benefits were driven by the tax impact of the pension settlement charges":

> Over the past several years, **the company has taken actions to reduce the risk profile of its worldwide retirement-related plans**, while at the same time increasing the funded status of the plans. In 2022 and 2024, non-participating single group annuity contracts were purchased from insurers which irrevocably transferred to the insurers certain defined benefit ("DB") pension obligations and related plan assets, as described below. There were no changes to the amount of benefits payable to the participants and beneficiaries of the plans transferred. These pension transfers reduced the company's pension obligations and assets by approximately the same amount and were purchased using assets from their respective retirement plans with no additional funding contributions required from the company. Each transaction resulted in the recognition of a one-time, non-cash, pre-tax pension settlement charge ("pension settlement charge") in the respective period of the pension transfer.
>
> …
>
> In September 2022, the IBM Personal Pension Plan ("Qualified PPP") irrevocably transferred to insurers approximately $16 billion of the Qualified PPP's DB pension obligations and related plan assets. As a result of this transaction, the company recognized a pension settlement charge of $5.9 billion ($4.4 billion net of tax) in the third quarter of 2022.
>
> In September 2024, the Qualified PPP irrevocably transferred to an insurer approximately $6 billion of the Qualified PPP's DB pension obligations and related plan assets. As a result of this transaction, the company recognized a pension settlement charge of $2.7 billion ($2.0 billion net of tax) in the third quarter of 2024.
>
> …
>
> **The company reported a benefit from income taxes of $218 million and $626 million** for the years ended December 31, 2024 and December 31, 2022, respectively. **The 2024 and 2022 tax benefits were driven by the tax impact of the pension settlement charges**, as described above.

(Emphasis added).

183. State Street also placed its financial interests in PRU, and IBM, ahead of the retirement security of retirees.

---

[66] 132,000 participants * $106 [Per Participant Rate for Flat-Rate Premium in 2025]) = $13,992,000. *See* https://www.pbgc.gov/employers-practitioners/premium-filings/rates.

184.    **State Street is the third-largest shareholder in PRU**, PICA's direct parent, holding shares valued at more than $1.8 billion.[67] State Street' significant holdings in PRU are only outdone by its holdings in IBM.

185.    **State Street is also the third largest institutional holder in IBM**, accounting for around 5.83% of all holdings in IBM as of September 2025.[68] State Street held 54,536,963 IBM common shares worth $16,076,405,953 as of August 14, 2025.[69]

186.    State Street's investment discretion in these IBM shares was "shared-defined."[70] The SEC explains that this means investment discretion can be shared with "insurance companies [like PICA] and their separate accounts[.]"[71] State Street had sole voting authority over 26,502,216 of these shares and shared voting authority over 6,176,078 of these shares as of September 2025.

187.    **State Street's significant institutional ownership allows it to exert considerable influence over both PRU's and IBM's corporate behavior**. Institutional investors can influence board decisions including appointments and strategic direction. They can engage in direct dialogue with management and the board, and institutional buying and selling decisions can lead to significant price movements in common stock holdings.

---

[67] *See* https://www.nasdaq.com/market-activity/stocks/pru/institutional-holdings (last accessed Sep. 4, 2025).

[68] https://finance.yahoo.com/quote/IBM/holders/ (last accessed Dec. 4, 2025).

[69] https://www.sec.gov/Archives/edgar/data/93751/000009375125000521/xslForm13F_X02/XML_Infotable.xml. "Institutional investment managers … that exercise investment discretion over $100 million or more in Section 13(f) securities must file [a] Form 13F." *FAQs About Form 13F*, SEC (May 23, 2025), https://www.sec.gov/rules-regulations/staff-guidance/division-investment-management-frequently-asked-questions/frequently-asked-questions-about-form-13f.

[70] https://www.sec.gov/Archives/edgar/data/93751/000009375125000521/xslForm13F_X02/XML_Infotable.xml.

[71] *Form 13F General Instructions*, SEC, at 8, available at https://www.sec.gov/files/form13f.pdf.

188.    **State Street can further utilize resolutions and proxy voting to exert influence over PRU and IBM**,[72] and can challenge management on a variety of issues. "In the case of pension plans, fiduciaries [like State Street] act as the proxy voters."[73] Here, the fact that State Street is the third largest institutional investor in PRU and IBM, *and* engages in proxy voting, means that pensioners' personal financial interests are more likely to be pushed aside in favor of these corporations' interests.

189.    **State Street also earns substantial asset management and custodial fees for its Common Stock holdings in PRU and IBM**. State Street manages "hundreds of index products"[74] on which State Street charges gross expense ratios that vary product to product. "The gross expense ratio (GER) is the total percentage of a mutual fund's assets that are devoted to running the fund."[75] These percentage-based fees earn State Street millions of dollars each year off its massive holdings.[76] State Street's ownership stakes in IBM and PRU are so large that they

---

[72] STATE STREET INVESTMENT MANAGEMENT, *Proxy Voting Choice Empowers Investors*, available at https://www.ssga.com/us/en/about-us/what-we-do/asset-stewardship/proxy-voting-choice (last accessed Sep. 4, 2025) ("Our proxy voting choice program covers **over 81%** of the eligible index equity assets we manage[.]") (emphasis added) (internal citation omitted).

[73] *Pension Plans and Proxy Voting*, SURVEY & BALLOT SYSTEMS, https://www.surveyandballotsystems.com/blog/engagement/pension-plans-proxy-voting/#:~:text=In%20the%20United%20States'%20retirement,on%20ownership%20and%20specific%20issues (last accessed Sep. 4, 2025).

[74] STATE STREET GLOBAL ADVISORS, INDEXING PLATFORM, at 2, available at https://web.archive.org/web/20250831104846/https://www.ssga.com/library-content/assets/pdf/global/index-investing/2025/indexing-platform-brochure.pdf; *see also id*., at 4 ("We also offer flexibility in our vehicle offerings — from SMAs, commingled vehicles, mutual funds, and ETFs.").

[75] Adam Hayes, *Gross Expense Ratio (GER): What it is, How it Works, Examples*, INVESTOPEDIA (Mar. 29, 2022), available at https://web.archive.org/web/20250104094140/https://www.investopedia.com/terms/g/gross-expense-ratio.asp.

[76] *See, e.g.*, STATE STREET, *SPDR® Dow Jones® Industrial Average℠ ETF Trust*, available at https://www.ssga.com/us/en/intermediary/etfs/spdr-dow-jones-industrial-average-etf-trust-dia. As of March 2024, "**IBM represents 2.87% ... of the fund's holdings**. This is not the only State Street fund that holds IBM." Nathan Reiff, *Top IBM Shareholders*, INVESTOPEDIA (updated May

raise serious questions as to whether State Street can—at all times—place pensions' interests ahead of the companies in which State Street holds **b**illions of dollars of stock.

190.    As a final note, **State Street's low-cost, scale-driven financial model further incentivized State Street to select PICA as an annuity provider,** contrary to State Street's fiduciary duty to protect retirees' pension benefits in favor of corporate or institutional gains. "By definition, passive index fund managers [like State Street] do not buy and sell equity securities based on any subjective market viewpoint. Instead, they are *passive*."[77] This is because:

> "**[State Street] exist[s] in a super competitive industry with extremely low management fees**, providing [State Street] with very little ability to spend resources on becoming informed about portfolio companies. Since [State Street is] generally uninformed, [it] cannot enhance the value of the stock market through [its] uninformed voting and engagement."[78]

191.    Thus, State Street's index fund model depends on aggregating large swaths of investments so as to achieve economies of scale. PRU has likewise stated that commingling in its insurance company separate accounts is done to achieve "economies of scale[:]"[79]

---

[77] James R. Copland, MANHATTAN INSTITUTE (Jan. 25, 2024), *Index Funds Have Too Much Voting Power: A Proposal for Reform*, https://manhattan.institute/article/index-funds-have-too-much-voting-power-a-proposal-for-reform (emphasis in original).

[78] *Id.*

[79] PRUDENTIAL, *Insurance Company Separate Accounts*, available at https://supplements.pionline.com/uploads/supplements/RSBR852.pdf.

raise serious questions as to whether State Street can—at all times—place pensions' interests ahead of the companies in which State Street holds **b**illions of dollars of stock.

190.    As a final note, **State Street's low-cost, scale-driven financial model further incentivized State Street to select PICA as an annuity provider,** contrary to State Street's fiduciary duty to protect retirees' pension benefits in favor of corporate or institutional gains. "By definition, passive index fund managers [like State Street] do not buy and sell equity securities based on any subjective market viewpoint. Instead, they are *passive*."[77] This is because:

> "**[State Street] exist[s] in a super competitive industry with extremely low management fees**, providing [State Street] with very little ability to spend resources on becoming informed about portfolio companies. Since [State Street is] generally uninformed, [it] cannot enhance the value of the stock market through [its] uninformed voting and engagement."[78]

191.    Thus, State Street's index fund model depends on aggregating large swaths of investments so as to achieve economies of scale. PRU has likewise stated that commingling in its insurance company separate accounts is done to achieve "economies of scale[:]"[79]

---

28, 2024), available at https://web.archive.org/web/20240528220409/https://www.investopedia.com/articles/insights/052216/top-5-ibm-shareholders-ibm.asp (emphasis added). As of October 2024, the **ETF Trust had 5,571,670 IBM shares for a value of $1,151,775,622**. Annual Report (Oct. 31, 2024), SPDR ® Dow Jones Industrial Average ETF Trust, at 1, available at https://www.ssga.com/us/en/intermediary/resources/doc-viewer#dia&annual-report. Another State Street funds that holds IBM is the SPDR S&P 500 ETF Trust (SPY). "The **SPY represents the third-largest fund owner of IBM with nearly 9.20 million shares for a market value of approximately $1.30 billion**" as of May 2021. Jea Yu, *Top 4 Mutual Fund Holders of IBM*, INVESTOPEDIA (updated May 16, 2021), available at https://web.archive.org/web/20220814130748/https://www.investopedia.com/articles/investing/032016/top-3-mutual-fund-holders-ibm-vfinx-vtsmx.asp (emphasis added).

[77] James R. Copland, MANHATTAN INSTITUTE (Jan. 25, 2024), *Index Funds Have Too Much Voting Power: A Proposal for Reform*, https://manhattan.institute/article/index-funds-have-too-much-voting-power-a-proposal-for-reform (emphasis in original).

[78] *Id.*

[79] PRUDENTIAL, *Insurance Company Separate Accounts*, available at https://supplements.pionline.com/uploads/supplements/RSBR852.pdf.

Insurance Company Separate Accounts are generally commingled investment vehicles that aggregate assets from more than one retirement plan to achieve economies of scale.[80]

192.    Here, the GACs expressly anticipate that PICA's "**commingled separate account** may hold assets supporting the payment obligations of Prudential under th[e] [GACs] following a Dedicated Account Conversion .... Such separate account **also supports Prudential's payment obligations under other group annuity contracts issued by Prudential**." ECF No. 25-3 at 4 (emphasis added); *see also* ECF No. 25-4 at 4.

193.    State Street acting as a purported "independent fiduciary" teed up a situation where it was enormously advantageous to select PICA.

194.    **There were plenty of other entities capable of choosing a suitable annuity provider**, including top accounting firms, law firms, actuarial firms, and other specialized consulting firms skilled at evaluating insurance company risk.

195.    Yet, despite obvious conflicts of interest, State Street claims to have acted as an "independent fiduciary" when it came to the choice of PICA for the instant IBM transaction, and State Street further claims that its choice of annuity provider was undertaken in the best interests of plan participants.

196.    If an Article III Judge owned millions (let alone **b**illions) in common stock in Prudential and/or IBM, they would be duty bound to recuse themself from this case. State Street's claim to have acted solely in the best interests of plan participants, even when it directly benefitted from IBM off-loading liabilities to PICA, is not credible.

197.    Plaintiffs maintain that Defendants intentionally failed to conduct an independent

---

[80] *Id.*

and impartial investigation when selecting PICA for the instant annuitization transaction. Plaintiffs further maintain and will prove that State Street was hired to provide "cover" for IBM's choice of PICA and to give the appearance of legitimacy to a process that was fatally flawed and contrived from the outset.

198.    In other words, **State Street purported to be independent but served to provide employers with a veneer of credibility**, in direct conflict with its fiduciary duty to act solely in the interests of Plan participants and beneficiaries. Selecting PICA enabled State Street to position itself for repeat engagements as a "independent" fiduciary in jumbo PRT deals, with major employers like IBM and Verizon.[81] Public press releases cover these PRT deals, and State Street had financial incentive to select PICA (the cheapest option) as opposed to the **safest** required option, helping State Street to, *inter alia*, secure goodwill among new and existing plan sponsors.

199.    One PRU article[82] boasts that "[a] second jumbo PRT deal with the same insurer isn't just extraordinary. It's a testament." However, choosing PICA for two major PRT deals is not at all "extraordinary," given that employers choose the lowest-cost annuity provider in nearly 80% of PRT transactions. Nor does PRU have any liability to IBM pensioners in the event of a PICA insolvency. *See supra* ¶¶ 111-16.

200.    The detailed data contained herein, all of which is publicly available, shows that PICA is entirely dependent upon affiliates domiciled in secrecy jurisdictions to make good on their liabilities to Plaintiffs. The interdependence among affiliates within the same controlled group of

---

[81] *See, e.g.*, https://news.prudential.com/latest-news/prudential-news/prudential-news-details/2024/Prudential-and-RGA-entrusted-to-fulfill-5.9-billion-in-pension-promises-for-Verizon/default.aspx.

[82] Discussing "Prudential and Verizon's [r]elationship," Verizon being another major employer like IBM who selected PICA. *See* https://www.prudential.com/risk-transfer/verizon-and-prudential.

companies, and the excessive amounts of sham reinsurance with captives and affiliates located in Arizona and Bermuda, would have led a loyal and prudent fiduciary to conclude that PICA was not a safe annuity provider for the 132,000 hard-earned pensions that were dumped on them by IBM with State Street's blessing.

201.     The deal with PICA immediately and quantifiably reduced the value of Plaintiffs' pension benefits. *See supra* ¶¶ 5-8. At the same time, by offloading liabilities to PICA, IBM improved its own financial position to the delight of one of its largest institutional investors—State Street. This type of self-dealing turns fiduciary duties on their head and is not permitted under ERISA.

202.     The selection of PICA took away all of the uniform protections intended by Congress under ERISA and reduced earned benefits to which Plaintiffs were entitled to benefits that are substantially and quantifiably less valuable.

203.     **Pensioners are not adequately protected by PICA's "Separate Account**"[83] which the GACs define as, "[p]rior to a Dedicated Account Conversion, the Dedicated Account." ECF No 25-3 at 6; ECF No. 25-4, at 6.

204.     ██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

---

[83] *See* https://www.prudential.com/risk-transfer/verizon-and-prudential ("Certain insurance products used to transfer pension risk, … may utilize a separate account established by PICA, …. The payment obligations specified in the group annuity contracts for such products are insurance claims supported by the assets in the separate account, and if such assets are not sufficient, by the claims-paying ability of PICA, subject to certain terms conditions, and limitations.").

205.    Per the GACs, "the Plan Trust will Transfer to Prudential the Initial Premium Amount... [which] will consist of cash and non-cash assets identified in the Cash and Transferred Assets Schedule." ECF No. 25-3 at 6; ECF No. 25-4 at 7. ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████

206.    ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

██████████████████████████████████
████████████████

█

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

████████████████████████████████████
████████████████████████████████████



████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

██   ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

211.    One of the only benefits of an "insurance separate account" is cost-efficiency. But

the drawbacks, including issues with liquidity, outweigh any purported benefit and include:

- Inadequate Disclosures[;]
- Participant Transparency[;]
- Portfolio Construction Variability: Another risk is the potential for significant variability in the portfolio construction of separate accounts compared to their mutual fund equivalents. This variability can lead to unexpected investment outcomes[;]
- Liquidity[;]
- Recordkeeper Portability[;] and
- Muddled Fiduciary Oversight[.][90]

212.    "In conclusion, [] insurance separate accounts ... come with risks related to

---

[90] MULTNOMAH GROUP, *Insurance Separate Accounts Usage in Qualified Retirement Plans* (Sep. 12, 2024), available at https://blog.multnomahgroup.com/forward-thinking/insurance-separate-accounts-in-qualified-retirement-plans (last accessed Sep. 4, 2025).

inadequate disclosures, portfolio construction variability, liquidity, and additional due diligence requirements."[91] For these reasons and more "[f]iduciaries should carefully evaluate the specific separate accounts they are considering adopting into their plans."[92]

213.    Plaintiffs did not choose PICA and Plaintiffs had no say in any aspect of IBM's decision to kick them out of the Plan. Plaintiffs and putative Class Members are stuck as certificate holders under a group annuity contract they do not control and cannot surrender or exchange for an individual annuity contract with a better capitalized mutual insurance company owned by policyholders rather than shareholders like State Street.

**VII.    Recent Losses Driven by PICA's Reinsurance Captives Further Show That Plaintiffs' Pension Benefits are Far Less Secure as a Result of the Transactions**

214.    PICA had a **$173 million capital decrease** in the year ended December 21, 2024. Gober Decl. ¶ 66. PICA's decrease in capital and surplus was primarily driven by losses from its reinsurance captives. *Id*. For example, losses from PICA's reinsurance captives drove a $2.39 billion unrealized capital loss. *Id*. These losses followed two mergers of PICA's captive reinsurers.

215.    The first merger was effective March 28, 2024. The surviving entity, Prudential Arizona Reinsurance Captive Company ("PARCC"), was a result of a merger between Prudential Universal Reinsurance Company "PURC"), Prudential Arizona Reinsurance Universal Company ("PARUC"), and Gibraltar Universal Life Reinsurance Company ("Gibraltar"). Gober Decl. ¶ 67.

216.    The second merger was effective November 20, 2024. The surviving entity, Prudential Arizona Reinsurance Captive Company ("PARCC"), was a result of a merger between Prudential Arizona Reinsurance Term Company ("PARTC"), Prudential Term Reinsurance

---

[91] *Id.*

[92] *Id.*

Company ("PRTC"), and Dryden Arizona Reinsurance Term Company ("Dryden"). *Id*.

217.    These losses further show that PICA's wholly owned affiliates to make good on their insider reinsurance "IOUs" is entirely speculative and opaque, and Plaintiffs' pension benefits are not secure.

## CLASS REPRESENTATION ALLEGATIONS

218.    Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23. Plaintiffs seek to represent a class defined as the 132,000 Plan participants and beneficiaries ejected from the Plan by the PICA transactions (the "Class").

219.    Plaintiffs reserve the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

220.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

221.    The following people are excluded from the Class: (1) any Judge presiding over this action and members of her or her family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

222.    Plaintiffs are empowered to bring this action under 29 U.S.C. § 1132(a)(2), (a)(3) and (a)(9).

223.    **Numerosity/Ascertainability:** Members of the 132,000-member Class are so numerous that their individual joinder herein is impracticable. The identity of such membership is readily ascertainable from Defendants' records.

224.    **Typicality:** The named Plaintiffs' claims are typical of the Class's claims. The Plaintiffs' claims arise from the same conduct, and seeks to redress the same legal violations, as the Class's claims.

225.    **Adequacy:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

226.    **Commonality and Predominance:** Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. Common legal and factual questions include, but are not limited to, whether Defendants violated 29 U.S.C. §§ 1104, 29 U.S.C. § 1105, and 29 U.S.C. § 1106, the proper form of relief, and whether Plaintiffs and the members of the Class are entitled to attorneys' fees and costs.

227.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device

presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

228.    **Rule 23(b)(1):**  The prerequisites for a (b)(1) class are satisfied. Prosecution of separate actions by Class Members would risk establishing incompatible standards of conduct for Defendants. Additionally, adjudications as to individual Class Members would, as a practical matter, dispose of the interests of other members of the Class and substantially impair their ability to protect their interests.

229.    **Rule 23(b)(2):** The prerequisites for a (b)(2) class are satisfied. Defendants' misconduct was generally applicable to the Class. The injunctive relief that Plaintiffs seek affects the Class as a whole. Individual Class Members do not have an interest in prosecuting their claims in this action individually because Class Members' claims are identical, and the injunctive relief sought will affect each Class Member equally.

230.    **Rule 23(b)(3):** The prerequisites for a Rule 23 (b)(3) class are satisfied because common questions of law and fact predominate and are susceptible to class-wide proof. Classwide litigation of this action is also superior to individual litigation because there are no difficulties in managing this case as a class action and there is a strong need to concentrate the Class Members' claims in one action.

//

//

//

//

## CAUSES OF ACTION

### COUNT I
**Against State Street**
**Breach of ERISA's Fiduciary Duties of Loyalty and Prudence**
**ERISA § 404(a),** *codified at* **29 U.S.C. § 1104(a)**

231.    Plaintiffs incorporate and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein. Plaintiffs bring this cause of action on behalf of themselves and members of the Class against State Street.

232.    As a fiduciary, State Street was required to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a). It was also required to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

233.    ERISA's fiduciary duties were especially important in the PRT transactions. For Plaintiffs and all of the tens of thousands of Class Members, their entire retirement savings and financial future depended on State Street fulfilling its obligations with exacting care. That is, Plaintiffs and the Class Members were already retired, and so returning to work and starting their retirement savings again from scratch is not a realistic possibility. The Plaintiffs and the Class Members depended on State Street's exacting care and loyalty to ensure that any PRT transactions were carried out, so as to protect their retirement savings. And under ERISA's duty of loyalty, protecting the retirement savings of Plaintiffs and the Class Members was the only permissible consideration for State Street.

234.    State Street breached its ERISA fiduciary duties of loyalty and prudence when it caused the PRT transactions between the Plan and PICA. State Street knew and had an affirmative duty to know all of the facts alleged herein regarding PICA's inappropriately risky financial

structure. Any reasonably prudent and loyal fiduciary would have known that a PICA-backed annuity presented a completely inappropriate risk for the Plaintiffs and Class Members, and no reasonably prudent and loyal fiduciary would have selected PICA as an annuity provider. Instead of completing the PRTs with PICA, State Street should have either (1) selected a better, safer annuity provider, such as the annuity providers identified in ¶¶ 128-29, *supra*, or (2) decided not to proceed with the transactions at all.

235.    In order to satisfy their fiduciary duties under ERISA, plan fiduciaries contemplating an annuitization transaction must at a minimum "conduct an objective, thorough and analytical search for the purpose of identifying and selecting providers from which to purchase annuities." IB 95-1(c). In the context of a PRT, choosing an annuity provider with an appropriate risk profile is paramount, from the perspective of the pensioners whose retirement savings are being transferred to the annuity provider—and whether the annuity provider is so risky that it could go out of business and be unable to fulfill its obligations is obviously the paramount concern. Thus, the Department of Labor has given guidance that the *safest* available annuity provider be selected. Here, PICA was *not* the safest available annuity provider. Nor was PICA even a *reasonably safe* annuity provider. Instead, PICA was among the *most risky, if not the single most risky*, annuity provider at the times of the IBM annuitization transactions at issue.

236.    If, at the end of State Street's process, there was no suitable alternative annuity provider, and only highly risky providers like PICA could be found, State Street had numerous alternatives to choosing PICA. As a fiduciary for the Plan, State Street had an affirmative duty to take any or all of the following actions to protect the Plaintiffs and Class Members, including:

>    (i)    State Street could and should have insisted that PICA provide additional security to support the annuity;

    (ii)    State Street could and should have asked IBM to purchase reinsurance or other credit support to reduce the riskiness of the PICA annuity;

    (iii)   State Street could and should have asked IBM itself to provide credit support or additional security to reduce the riskiness of the PICA annuity;

    (iv)   State Street could and should have recommended that IBM not move forward with a PRT at those times;

    (v)    State Street could and should have refused to move forward with a PRT;

    (vi)   State Street could and should have resigned as independent fiduciary, rather than approving the PRT transaction with PICA; and

    (vii)  Failing any other option, State Street could and should have petitioned a court for guidance.

237.    Any reasonably prudent and loyal fiduciary would have taken any or all of these actions before approving the PRTs with PICA. Taking any or all of these actions would have been in the best interests of the Plaintiffs and Class Members. But State Street did none of these things, and instead signed off on the PRTs with PICA.

238.    State Street's decision to engage in the PRTs with PICA was not merely imprudent, but also disloyal. State Street had an interest in serving as an independent fiduciary in additional pension risk transfer transactions, and if it took appropriate action to protect the plan, its reputation as an employer-friendly fiduciary would be damaged. In addition, State Street had a pecuniary interest in completing the PRTs, which benefitted both IBM and PICA's parent, Prudential, and State Street owned (directly or indirectly) large investments in both these companies.

239.    As a result of the PRTs here with PICA, Plaintiffs and the Class Members have been irreparably damaged. The overall value of Plaintiffs' and the Class Members' pension benefits decreased using objective and calculable metrics, both in comparison between the value of an appropriately safe annuity from a reputable, well-financed provider and the value of the

annuities Plaintiffs and the Class Members received from PICA, and in comparison between the value of an the PICA annuity Plaintiffs received and the value of their pension benefits in the absence of the PICA deal.

240.    As a result, State Street violated its fiduciary duties and is therefore subject to appropriate equitable relief under § 1132(a)(3), and is liable for damages in an amount to be determined at trial as well as other appropriate relief, including equitable relief, to the Plaintiffs and Class Members under § 1132(a)(9).

**COUNT II**
**Against IBM**
**Breach of ERISA's Fiduciary Duties of Loyalty and Prudence**
**ERISA § 404(a), *codified at* 29 U.S.C. § 1104(a)**

241.    Plaintiffs incorporate by reference and re-allege herein paragraphs 1 – 230. Plaintiffs bring this cause of action on behalf of themselves and members of the Class against IBM.

242.    As a fiduciary, IBM was required to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a). It was also required to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

243.    At all relevant times, IBM was the Plan's named fiduciary under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). IBM was also the Plan's administrator, and acted as a functional fiduciary under ERISA § 3(21), 29 U.S.C. § 1002(21) in a host of capacities.

244.    While the initial decision to engage in a PRT was a settlor decision not subject to ERISA's fiduciary duties, all of the decisions about how to carry out the PRT were fiduciary decisions that were subject to ERISA. IBM was responsible for many such decisions. IBM was responsible for appointing State Street as an independent fiduciary. Appointing State Street carried

fiduciary obligations for IBM at the outset to ensure that State Street was willing and able to fulfill State Street's fiduciary role prudently and loyally. After appointing State Steet, IBM had an ongoing obligation to monitor State Street's performance to ensure that State Street was appropriately carrying out State Street's fiduciary role. And, finally, IBM had an obligation to review State Street's decision to engage in the PRTs with PICA to ensure that State Street had fulfilled its obligations. IBM violated all of those obligations in this case.

245.    IBM selected State Street as an independent fiduciary for the PRTs despite State Street's abysmal track record in other PRT cases. State Street routinely selected the riskiest, most dubious insurance providers as PRT counterparties. IBM's decision to select State Street anyway was either completely imprudent and made with no consideration of State Street's track record, or reflected IBM's disloyal pre-determination about the type of PRT it wanted to undertake.

246.    Similarly, given the significance of the PRT transactions to the Plaintiffs and Class Members, IBM's duty to monitor State Street's activities was especially acute. Here, IBM should have realized that State Street's consideration and selection of PICA as a PRT counterparty was completely imprudent, and IBM should have intervened and insisted that State Street reject PICA as a counterparty. Failing that, IBM should have removed State Street from its role and either abandoned a PRT at the time or sought out a new independent fiduciary who would conduct a reasonable and appropriate search for an annuity provider with an appropriate risk profile for the seriousness of the transaction at issue. IBM could have asked State Street to insist on a better annuity provider. IBM could have determined not to push ahead with a PRT at all if it determined that no reasonably prudent and financially sound annuity provider could be located. IBM could have sought additional insurance guarantees, security, or credit support for the annuities, and could have gone to court to seek guidance. Any reasonably prudent and loyal ERISA fiduciary would

have taken some or all of these actions before turning over the retirement security of tens of thousands of people to an insurance company with PICA's risk profile.

247. Defendant IBM breached its fiduciary duties by, *inter alia*:

(i) Failing to monitor and evaluate the process by which State Street investigated the annuity providers available for the annuitization transactions, to ensure the process was objective and sufficiently thorough, as opposed to a pre-ordained outcome;

(ii) Failing to monitor and evaluate the conflicts of interest inherent in State Street's selection of PICA for the annuitization transactions, which selection would materially benefit IBM and State Street;

(iii) Failing to monitor and evaluate the process by which State Street selected PICA as an annuity provider for the transactions described herein, especially in light of PICA's billions of dollars in exposure to ModCo transactions with affiliates, its use of captive reinsurers and affiliates in Arizona and Bermuda, and the high-risk practices described in detail in this Amended Complaint;

(iv) Failing to monitor the process by which State Street ruled out several, safer annuity providers for the annuitization transactions described herein, including but not limited to New York Life Insurance Company, The Guardian Life Insurance Company of America, and TIAA-CREF Life Insurance Company; and

(v) Failing to remove individuals responsible for the selection of PICA as an unsuitable annuity provider.

248. IBM did none of those things. Instead, IBM went forward with the PICA annuity.

249. IBM breached its fiduciary monitoring duties by failing to ensure that the process of selecting PICA as the annuity provider complied with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(A)–(B) and IB 95-1.

250. Among other things, Defendant IBM knew of the circumstances that rendered State Street's conduct a breach of fiduciary duty and participated knowingly in that breach and did not make any efforts to remedy the breach.

251. As a result of the PRTs here with PICA, Plaintiffs and the Class Members have been irreparably damaged. The overall value of Plaintiffs' and the Class Members' pension

benefits decreased using objective and calculable metrics, both in comparison between the value of an appropriately safe annuity from a reputable, well-financed provider and the value of the annuities Plaintiffs and the Class Members received from PICA, and in comparison between the value of an the PICA annuity Plaintiffs received and the value of their pension benefits in the absence of the PICA deal.

252.    Had IBM fulfilled its fiduciary monitoring duties, PICA would have been rejected in favor of a safe annuity provider, or IBM would have decided not to proceed with the transactions. As a result of those monitoring failures, Plaintiffs and Class Members suffered harm including an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits.

253.    As a result, IBM is subject to appropriate equitable relief under § 1132(a)(3) and is liable for damages and other appropriate relief, including equitable relief, to the Plaintiffs and Class Members under § 1132(a)(9).

254.    As a result, IBM violated its fiduciary duties and is therefore subject to appropriate equitable relief under § 1132(a)(3), and is liable for damages in an amount to be determined at trial as well as other appropriate relief, including equitable relief, to the Plaintiffs and Class Members under § 1132(a)(9).

### COUNT III
**Against State Street and IBM**
**Prohibited Transaction**
**ERISA § 406(a)(1)(A), (C), and (D), *codified at* 29 U.S.C. § 1106(a)(1)(A), (C), and (D)**

255.    Plaintiffs incorporate by reference and re-allege herein paragraphs 1 – 230. Plaintiffs bring this cause of action on behalf of themselves and members of the Class against Defendants State Street and IBM.

256.    ERISA § 406, *codified at* 29 U.S.C. § 1106 "supplements the fiduciary's general

duty of loyalty to the plan's beneficiaries by categorically barring certain transactions deemed likely to injure the pension plan." *Cunningham v. Cornell Univ.*, 604 U.S. 693, 697 (2025) (citations omitted).

257.    In pertinent part, § 1106(a), provides that "[e]xcept as provided in section 1108 of this title: (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect— (A) sale or exchange, or leasing, of any property between the plan and a party in interest; … (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…."

258.    State Street was a fiduciary with respect to the Plan for purposes of the PRTs, and in that capacity, State Street "caused" the Plan to "engage" in the PRT transactions with PICA. Similarly, IBM was also a fiduciary who could be said to have caused the Plan to engage in the PRTs with PICA.

259.    PICA was a "party in interest" with respect to the Plan under ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B) because PICA was "a person providing services to such plan." In particular, through the PRTs, PICA assumed responsibility for the obligations that IBM and the Plan owed to the Plaintiffs and Class Members. Those assumed obligations included making payments of pension benefits, recordkeeping, administration, and communicating with the Plaintiffs and Class Members, among others.

260.    State Street knew, or should have known, that PICA was providing services to the Plan.

261.    State Street knew, or should have known, that the PRTs constituted a direct sale or exchange of property between the Plan and PICA, in particular, the Plan assets sold to PICA in

exchange for PICA assuming the Plan's obligations. Thus through the PRTs, State Street engaged in a transaction prohibited by § 1106(a)(1)(A).

262.    State Street knew, or should have known, that the PRTs constituted the provision of services between the Plan and PICA, in particular, PICA's assumption of the Plan's obligations to the Plaintiffs and Class Members. Thus, through the PRTs, State Stret engaged in transactions prohibited by § 1106(a)(1)(C).

263.    State Street knew, or should have known, that the PRTs constituted a transfer of Plan assets to PICA. Thus, through the PRTs, State Street engaged in a transaction prohibited by § 1106(a)(1)(D).

264.    As a result, State Street engaged in a prohibited transaction and is subject to appropriate equitable relief under § 1132(a)(3) and is liable for damages and other appropriate relief, including equitable relief, to the Plaintiffs and Class Members under § 1132(a)(9).

**COUNT IV**
**Against IBM**
**Breach of Co-fiduciary Duty**
**ERISA § 405(a)(1)-(3), *codified at* 29 U.S.C. § 1105(a)(1)-(3)**

265.    Plaintiffs incorporate by reference and re-allege herein paragraphs 1 – 230. Plaintiffs bring this cause of action on behalf of themselves and members of the Class against IBM.

266.    ERISA § 405(a) provides that:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

    (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

    (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

86

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

267.    Here, IBM knowingly participated in State Street's fiduciary breach. IBM knew that PICA was completely inappropriate as a pension annuity provider, IBM knew that State Street would select PICA, IBM approved State Street's selection of PICA, and IBM directly profited from State Street's imprudent and disloyal selection of PICA. Thus, IBM violated its co-fiduciary duties in § 1105(a)(1).

268.    Here, IBM's fiduciary failings (set out in detail *supra* ¶¶ 241-54) enabled State Street's disloyal and imprudent fiduciary breaches in selecting PICA as annuity provider (set out in detail *supra* ¶¶ 231-40). Thus, IBM violated its co-fiduciary duties in 1105(a)(2).

269.    Finally, IBM had knowledge of State Street's breaches of its fiduciary duties in the selection of PICA as annuity provider. But, as set out in detail *supra* ¶¶ 241-54, IBM took no action to prevent or remedy State Street's fiduciary breaches, much less reasonable efforts under the circumstances to remedy State Street's breach. Thus, IBM violated its co-fiduciary duties in 1105(a)(3).

270.    As a result, IBM is subject to appropriate equitable relief under § 1132(a)(3) and is liable for damages and other appropriate relief, including equitable relief, to the Plaintiffs and Class Members under § 1132(a)(9).

### COUNT V
### Against IBM
### Knowing Participation in State Street's Fiduciary Breaches and Prohibited Transactions
### ERISA § 502(a)(3) and (a)(9), *codified at* 29 U.S.C. § 1132(a)(3) and (a)(9)

271.    Plaintiffs incorporate by reference and re-allege herein paragraphs 1 – 230. Plaintiffs bring this cause of action on behalf of themselves and members of the Class against IBM.

272.    ERISA § 502(a)(3) permits ERISA plan participants, such as Plaintiff, to bring a civil action "to obtain other appropriate equitable relief" to "redress" "any act or practice which violates any provision" of ERISA. ERISA § 502(a)(9) also authorized ERISA plan participants whose interests have been replaced with annuities to "obtain appropriate relief."

273.    The Supreme Court has held that non-fiduciaries who receive the benefit of conduct that violates ERISA may be subject to equitable remedies under ERISA § 502(a)(3) if they have "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000).

274.    Even if IBM were somehow not a fiduciary for the Plan, IBM had a duty to know that State Street was entering the PRTs with PICA and had a duty to know why PICA was entirely too risky to serve as an annuity provider for the Plaintiffs and Class Members. IBM had actual knowledge of all of the terms of the PRTs, as IBM itself signed the PRT agreements with PICA. Thus, IBM had actual and/or constructive knowledge of all of the terms of the PRTs with PICA, and all of the salient facts about PICA's risk profile that made it inappropriate as an annuity provider.

275.    And, instead of taking action to prevent the imprudent and disloyal PRTs with PICA, IBM benefitted from those transactions for its own account by saving significant amounts in future contributions to the Plan, including PBGC premiums.

276.    Thus, IBM is subject to other appropriate equitable relief for its knowing participation in State Street's fiduciary breaches and prohibited transactions, including (for example) constructive trust, disgorgement, accounting, and equitable surcharge.

//

//

## RELIEF DEMANDED

WHEREFORE, Plaintiffs, on behalf of themselves all other similarly situated Plan participants and beneficiaries, pray for relief and judgment, as follows:

a. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

b. For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

c. Damages under 29 U.S.C. § 1132(a)(9), measured by (i) the risk-adjusted economic value of the income stream between the PICA annuity that Plaintiffs and Class Members received and the value of an annuity from a reasonably safe, low-risk provider selected after a prudent and loyal annuity search (such as the safest available annuity), over the reasonable expected life of the entire cohort; or (ii) in the alternative, the risk-adjusted economic value of the income stream between the PICA annuity that Plaintiffs and Class Members received and the value of the ERISA protected pension benefits backed by the employer and by the PBGC that participants lost in the PRT with PICA, over the reasonable expected life of the entire cohort;

d. Imposing equitable relief under 29 U.S.C. § 1132(a)(3) and (a)(9), including but not limited to:

    1. equitable surcharge, constructive trust, or disgorgement, of the difference between the cost of selecting PICA as the annuity provider and the cost of selecting a reasonably safe, low-risk provider selected after a prudent and loyal annuity search (such as the safest available annuity);

    2. payment of fixed rate PBGC premiums into a fund for the benefit of all impacted participants covering the time before an appropriate annuity is provided for the Plaintiffs and Class Members;

    3. an order requiring Defendants to obtain appropriate reinsurance, security, surety bond or other credit support from a reputable, low risk annuity provider selected at arm's length through an appropriate process to backstop the group annuity contract purchased from PICA;

    4. an order requiring Defendants to remain secondarily liable for Plaintiffs' pension benefits in the event of a PICA insolvency or impairment; or

    5. injunctive relief to prevent IBM from holding the group annuity

contract outside of the Plan and preventing IBM from depriving impacted retirees from ERISA's uniform and comprehensive protections.

e.  Order that Defendants pay prejudgment interest;

f.  Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

g.  Order the payment of interest to the extent it is allowed by law; and

h.  Grant any other relief as the Court deems appropriate to remedy the ERISA violations.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiffs demand a trial by jury of all issues so triable.

Dated: December 8, 2025                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Yitzchak Kopel*
          Yitzchak Kopel

Yitzchak Kopel (BBO # 716245)
Caroline C. Donovan*
Logan J. Hagerty*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: ykopel@bursor.com
        cdonovan@bursor.com
        lhagerty@bursor.com

**EDWARD STONE LAW P.C.**
Edward S. Stone*
205 East 42nd Street, Suite 1900
New York, NY 10017
Telephone: (203) 504-8425
Facsimile: (203) 348-8477
E-Mail: eddie@edwardstonelaw.com

**SCHNEIDER WALLACE**

90

**COTTRELL KIM, LLP**
Todd M. Schneider*
John J. Nestico*
James A. Bloom*
Charlotte Manyasli*
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone:     (415) 421-7100
Facsimile:     (415) 421-7105
Email: tschneider@schneiderwallace.com
        jnestico@schneiderwallace.com
        jbloom@schneiderwallace.com
        cmanyasli@schneiderwallace.com

*Attorneys for Plaintiff*

*\*Pro Hac Vice application forthcoming*

91

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on December 8, 2025, a true and correct copy of the foregoing was served on all counsel of record via email.


*/s/ Yitzchak Kopel*
Yitzchak Kopel